In this proceeding the cestuis que trustent under the will of William Frank Shelton, Jr. (known to the record as Frank) seek the removal of the trustees. Testator was twice married. His first wife was Edith Shelton. They had one child, William Frank Shelton, III. His second wife was Ruby Shelton. They had two children, Frank Joseph and Mariam Claire Shelton. By his last will and testament, Mr. Shelton, appointed Hal H. McHaney, A.J. Langdon, Jr., and Lee Shelton trustees of his residuary estate and contemplated the final distribution of his estate in equal parts to Ruby, William Frank, III, Frank Joseph and Miriam Claire Shelton. The decree was for the defendants.
Testator died December 22, 1929. Substantially all of testator's assets, embracing considerable real and personal property, were devised and bequeathed as follows (provisions of no consequence to the instant issues being omitted):
"Seven. I give, devise and bequeath all the rest, residue and remainder of my estate, real or personal, and wheresoever situate, which I may own or have the right to dispose of at the time of my decease, unto my brother Lee Shelton of Kennett, Missouri, Hal H. McHaney of Kennett, Missouri, and A.J. Langdon, Jr., of Hornersville, Missouri, as trustees, to have and to hold the same in trust, nevertheless, for the joint use and benefit of my wife Ruby Shelton, my son William Frank Shelton, III, my son Frank Joseph Shelton and my daughter, Miriam Claire Shelton, with the powers and authority and subject to the terms, conditions and provisions hereinafter set forth.
"The trustees named, and their successors, during the continuance of said trust, shall hold and manage the property held in trust with power to pay taxes and other charges against the property, and all legal and proper expenses incident to its care and protection, and such other expenses as may be connected with the execution of this trust; to sell, assign, convey or otherwise transfer any part of said property upon such terms or conditions as said trustees, or their successors, may deem advisable for the best interest of my estate;. . . . to receive, and receipt for, the proceeds of any such sale, transfer, hypothecation or encumbrance; to invest, or reinvest, the same in such manner as said trustees, or their successors, may deem best; to receive and receipt for, any and all income that may be derived *Page 127 
from said property, or the investment or reinvestment of the proceeds thereof; . . . to continue any business arrangements, or contracts, which I may have with others, or to which said property or any part thereof may be subject, as long as, in the opinion of said trustees or their successors, the continuance thereof would be advantageous to the interest of said trust estate; to lease or rent any part of the real or personal property belonging to said trust estate upon such terms or conditions as they, or their successors, may approve; to make or carry out any agreement with any person, or persons, for the sale, division or distribution of any property said trustees, or their successors, may hold or own in common with such other person, or persons, provided, however, said trustees, or their successors, shall divide the property owned jointly by me with my brother Lee Shelton in kind as nearly as same in their opinion is practicable, and in the event said property cannot be divided equally in kind, said trustees shall make contribution from the principal or income of my estate, or shall accept contribution from my brother Lee Shelton sufficient to equalize said division of said joint property in kind. . . .
"I further request and direct my said trustees, or their successors, to make or procure a division of my property, held jointly with my brother Lee Shelton, prior to the expiration of five (5) years following my demise.
"A sufficient amount of the income derived from the trust estate, hereby created, during the first five (5) years after my demise, after deducting all taxes and expenses of administration, including reasonable fees for the services of the trustees herein named, provided the aggregate of such fees shall not exceed in any one year ten percent (10%) of the net income from my said estate during such year, together with such part of the principal of my estate as in the absolute discretion of the trustees herein named may be necessary and/or advisable, shall be used by said trustees for the support, maintenance, education and care of the beneficiaries of this trust, during such five (5) year period, and same shall be paid to them from time to time in convenient amounts.
"Eight. At the end of said five (5) year period, the said trust estate shall be divided into four (4) parts, equal in amount and value, by the within named trustees, or their successors, and one part shall be paid over and delivered to my wife, Ruby Shelton, to have and to hold as her absolute property in fee simple.
"Nine. The remaining three parts of said trust estate shall remain in the hands of my trustees, or their successors, for the separate use and benefit of each of William Frank Shelton, III, Frank Joseph Shelton and Mariam Claire Shelton, until such time, or times, as hereinafter provided. . . .
[By paragraphs "(a)," "(b)" and "(c)" of Clause "Nine," the *Page 128 
trust estates of William Frank, III, Frank Joseph and Miriam Claire Shelton are continued under practically like conditions and are made to terminate and vest in fee upon said respective beneficiaries attaining the age of thirty years.]
"Fifteen. The general purpose and intention in creating the trust provided for herein, whereby the trustees are given broad, general powers and are substituted in my place and stead as nearly as practicable, has been done by me with the desire that during the first, five (5) year period after my demise said trustees shall do everything possible, by careful management, to protect my estate from waste, which often occurs in the administration and distribution of estates, to the end that my estate may be gotten into the best possible condition for division among my beneficiaries, by the end of such five (5) year period, as provided herein, and, also, for the proper care, maintenance, education and support of my beneficiaries in the way I deem best during the periods their said property is entrusted as provided herein, and, also, to the end that said estates will be better preserved for their ultimate enjoyment, use and benefit. . . .
"Seventeen. This will has been carefully planned by me and it is my deliberate judgment that all of its provisions are wise and just and that the plan as a whole will prove beneficial and satisfactory to my wife and family. . . .
"Eighteen. I hereby nominate and appoint Lee Shelton and Hal H. McHaney of Kennett, Missouri, and A.J. Langdon, Jr., of Hornersville, Missouri, executors of this my will and trustees of each trust hereby and herein created, and I direct that no bond or other security be required of them to qualify them to act as such executors or trustees in the State of Missouri, or any other State. . . ."
[1] Many of the issues presented here are factual rather than legal. Plaintiffs' abstract places emphasis upon testimony favorable to plaintiffs while minimizing some of the testimony favorable to defendants; and defendants have filed an additional abstract. Defendants, having prevailed below, are entitled to have the full effect of that testimony favorable to their judgment considered upon review. Our task has not been lightened by the necessity of reviewing and comparing the two rather lengthy abstracts.
While this court passes on the weight of the evidence upon the review of a cause in equity, we accord due deference to a chancellor's determination of factual questions, especially, from necessity and convenience arising out of the superior opportunity afforded a trial court, facts determinable from conflicting viva voce testimony. [Howard v. Zweigart (Banc), 197 S.W. 46, 48(1); Fendler v. Roy, 331 Mo. 1083, 1095, 58 S.W.2d 459, 465(8, 9); Bank of Brimson v. Graham, 335 Mo. 1196, 1204, 76 S.W.2d 376, 380(4); Jones v. Jones, 333 Mo. 478, 484, 63 S.W.2d 146, 149(1); 5 C.J.S., pp. 757, 765, secs. 1663, 1664; 3 Am. Jur., p. 479, sec. 912.] *Page 129 
[2] The removal of a trustee calls for the exercise of a sound judicial discretion, which should not be abused. [Gaston v. Hayden, 98 Mo. App. 683, 693, 73 S.W. 938, 941; 65 C.J., p. 617, sec. 447, n. 28; 1 Restatement of the Law of Trusts, p. 279, sec. 107(a), a.] A trustee will not "be removed for every violation of duty, or even breach of trust, if the fund is in no danger of being lost. . . . There must be a clear necessity for interference to save the trust property. Mere error, or even breach of trust, may not be sufficient; there must be such misconduct as to show a want of capacity or of fidelity, putting the trust in jeopardy." 1 Perry on Trusts (7 Ed.), sec. 276 nn. 93-94. See also: 3 Story Eq. Jur. (14 Ed.), sec. 1701; Mississippi Val. Trs. Co. v. Buder, 47 F.2d 509, 511. Defendants are testamentary trustees, named by the testator. "The court will less readily remove a trustee named by the settlor than a trustee appointed by the court or by a third person who is by the terms of the trust authorized to appoint a trustee. The court will not ordinarily remove a trustee named by the settlor upon a ground existing at the time of his appointment and known to the settlor and in spite of which the settlor appointed him, although the court would not have appointed him trustee." 1 Restatement of the Law of Trusts, p. 280, sec. 107(a), f. See also: 1 Perry, supra; 65 C.J., pp. 616-618, secs. 447, 448; Harvey v. Schwettman (Mo. App.), 180 S.W. 413, 415(1); Wiegand v. Woerner, 155 Mo. App. 227, 264, 134 S.W. 596, 608.
[3] I. Hal H. McHaney is a lawyer. Plaintiffs say the evidence sustains their charge that he intended to, and with the cooperation of the other trustees, did fraudulently collect $3000 for services as an attorney, and $600 for services performed by his stenographer from the Shelton estate; and, therefore, said trustees should be removed.
a. Testator's estate inventoried $609,628.70. Testator, or with his brother Lee Shelton, owned approximately 10,000 acres of real estate situate in Missouri and Arkansas, and reference to Re Shelton's Estate, 338 Mo. 1000, 1004, 93 S.W.2d 984, 995, discloses testator's personal estate aggregated over $400,000. Testator and his brother Lee engaged in business ventures under the names of Shelton Brothers and Shelton Store Company — the latter being the common designation of the William Frank Shelton, Jr., Store Company, a corporation. The record indicates the Store Company had a capital stock of $25,000, divided into 250 shares, of which testator owned one share less than three-fourths, the other shares being owned by Lee. The book value of the corporate assets at the time of testator's death was between $320,000 and $350,000. The brothers cleared their financial transactions through the Store Company's cash and bank accounts. Prior to testator's death McHaney was his personal attorney and thereafter McHaney rendered legal services to the Shelton estate, *Page 130 
Shelton Store Company and Shelton Brothers. Shortly after testator's death a former bookkeeper and secretary of the Store Company was dismissed and McHaney appears thereafter to have discharged the duties of secretary for that corporation. McHaney testified he first expected to receive compensation for legal services rendered the estate, and prepared a statement covering legal services performed for the estate — plaintiffs' Exhibit B. There was testimony to the effect the services there set out were reasonably worth $5000. Mrs. Ruby Shelton protested and McHaney never presented the account to the Shelton estate. He then prepared a statement (Defendant's Exhibit 1) covering legal services rendered at the instance (according to McHaney) of trustees Shelton and Langdon to the Shelton Store Company between January 4th and November 25, 1930, and presented it to Lee Shelton and A.J. Langdon, who, as directors of the Store Company and in the absence of McHaney, also a director, allowed McHaney $3000 for services as "secretary and general counsel of the company." Several attorneys testified the services itemized on said Exhibit 1 were reasonably worth $3,000. Plaintiffs do not question the necessity for the services or the reasonableness of the charges therefor. Payment by the Shelton Store Company resulted in Lee Shelton paying that portion of said expenses reflected by his ownership of stock in said corporation. Testator realized and contemplated the proper administration of the trust estate would necessitate outlays for legal services. Clause Seven of the will expressly empowered the trustees "to pay taxes and other charges against the property, and all legal and proper expenses incident to its care and protection. . . ." Testator informed trustee Langdon at the time he secured Langdon's consent to act that he expected McHaney to be paid for services rendered as an attorney in addition to other fees to be paid McHaney. We rule, under the broad provisions of this trust substituting the trustees in the place of testator, that payment for bona fide legal services rendered the trust estate by McHaney at the instance of the other trustees was permissible.
b. Mr. McHaney's stenographer performed all the necessary stenographic services connected with the administration of the Shelton estate which was pending in the probate court for approximately fourteen months. His stenographer's salary of $50 per month was increased during the pendency of the said administration to $65. McHaney estimated three-fourths of his stenographer's time was devoted to stenographic services rendered the Shelton estate, and that the services thus rendered were reasonably worth $600. After conference with his co-executors, an item of $600 for stenographic services was presented to and approved by the probate court for allowance. McHaney, having theretofore paid his stenographer, received this. *Page 131 
In passing upon this ground for removal, as well as others, we give consideration to the whole of the conduct of defendants as trustees. The estate was substantial, involved many and varied commercial interests and necessitated (as detailed in the testimony) the performance of considerable stenographic work during its fourteen months pendency. In disallowing this credit in Re Shelton's Estate, 338 Mo. 1000, 1014(6), 93 S.W.2d 684, 691(12), we said: "We do not mean to hold an executor or administrator may not legally employ a stenographer or other employee to perform services conducive to the economical and proper conservation and administration of the estate which the executors or administrator himself cannot personally perform and obtain credit for the reasonable compensation paid to such employee. But the evidence in this case does not justify allowance of said credit. . . ." [Italics ours.] [See 24 C.J., p. 96, sec. 529.] The item was one involving decedent's estate as distinguished from the trust estate. The executors (trustees) were not stenographers, and, of course, had not been selected by the testator to facilitate the rendition of such service. They, no doubt, considered stenographic services entitled to reasonable compensation. We think the record fails to disclose improper motive or fraudulent design; and, believing the issue involves a mistake of judgment for which reimbursement to the estate should afford ample redress rather than a serious breach of trust or misappropriation of funds for which the drastic remedy of removal should be exercised, we refuse to disturb the chancellor's conclusion.
[4] II. William Frank Shelton, III, known in the record as "Bill," lived with his mother Edith Shelton, in the state of California. Soon after his father's death he became entitled to the proceeds of a $10,000 insurance policy his father had taken out in his favor and $750 from the sale of an automobile his father had willed to him. The probate court of California having jurisdiction appointed Edith Shelton guardian and curatrix of the minor's, Bill's, estate and allowed Mrs. Shelton $500 monthly for Bill's support. After advancing $300 or $400 the trustees discontinued remittances to him in February, 1930, and during the course of the ensuing controversy, informed Bill and his mother they thought it was not to Bill's advantage to have too much money; that whenever deemed necessary and advisable they would be glad to make reasonable remittances to Bill; and that, upon division, Bill's share of the estate would be increased by whatever might be determined to be reasonable for the purposes specified in the will during the interval he was receiving $500 monthly from the insurance money. Bill advised the trustees in May, 1931, that the guardianship funds had been exhausted. The trustees had made inquiry covering a reasonable allowance for students at the University Bill was attending and thereupon made monthly remittances of $175 for Bill's support, maintenance, education *Page 132 
and care, supplementing the same as occasion required with additional remittances to take care of miscellaneous items, such as matriculation fees, books, medical bills, et cetera. Clause 7 of the will provides that a sufficient amount of the income from and principal of the trust estate "as in the absolute discretion of the trustees herein named may be necessary and/or advisable" shall be used by said trustees for the support, maintenance, education and care of the beneficiaries during the period here involved. If due consideration be given the fact that during a portion of the five year period remittances were not made for said purposes upon a division of the trust estate, we perceive little occasion under the facts for complaint. In December, 1933, Bill wrote trustee McHaney that in the past few years he had come to realize the value of money more than ever before. Testator vested the trustees with broad, general powers, attempting to substitute them in his place and stead as nearly as practicable to the end that by careful management his estate be protected from waste. We think testator, if here, would commend rather than condemn the action of the trustees here under discussion. Note the observations made in connection with this subject matter in Shelton v. McHaney, 338 Mo. 749, 769, 92 S.W.2d 173, 183 (6, 7).
[5] III. Plaintiffs say that the trustees refused to account and in their argument assert they failed to furnish copies of audits of the estate and the Store Company to Ruby Shelton and Bill Shelton; and that McHaney refused to submit to Ruby Shelton an itemized statement covering legal services rendered the estate by him during 1930. The record discloses the auditor had specific instructions to prepare a copy of each audit for Ruby Shelton; that McHaney had instructed his stenographer to mail a copy of each audit to Ruby Shelton; that Ruby Shelton was furnished a copy of the audit of the estate and also the Store Company for 1930 and was advised the records of the trustees and of the Store Company were open for her inspection at all times, and she was invited to (and did) inspect them from time to time; that the trustees informed Bill Shelton they did not have a copy of the 1930 audit available for him, but forwarded a statement of the receipts and disbursements, advising him if he desired a copy of the audit they would prepare one; and that Bill did not request a copy. Ruby Shelton was shown four audits and testified she could not say whether they were all the audits she received or not. After Ruby Shelton protested the allowance of any attorney's fees to McHaney, he informed her he felt justified in refusing to submit "any further statements" to her in that matter, but expressed a willingness to discuss it with her representative. We understand from the record that Ruby Shelton had information concerning the legal services rendered by McHaney. Again, the chancellor's conclusions are sufficiently supported by the evidence. *Page 133 
[6] IV. Plaintiffs say the trustees have been derelict in their duties and therefore should be removed. Preliminary to a discussion of these issues we again direct attention to the stated intent of the will, especially the broad general powers vested in the trustees, the substitution of the trustees for testator, and the deliberate judgment of testator that all the provisions of the will were wise and just.
(a) The Store Company was used by the brothers to facilitate financial transactions, that is, they carried sufficient cash to the credit of the Store Company account to finance the various Shelton interests and book entries were kept to reflect the various business enterprises and the individual interests of the two brothers. Each drew on the Store Company's account for such cash as they might need. At the time of his death testator owed (we use round numbers) the Store Company $34,000 and Lee Shelton owed the Store Company $33,000. An audit of the affairs of the brothers revealed that testator was entitled to credits reducing his indebtedness to $18,000. The William Frank Shelton, deceased, estate was in the course of administration in the probate court. The executors desired to close this administration in due course. They secured the allowance of a demand covering said $18,000 principal amount, with no interest added. The Store Company had not declared a dividend for a number of years and had undivided profits in excess of $300,000 consisting largely of investments in real estate of a nonliquid nature. It did not have sufficient cash on hand to permit of the handling of all necessary transactions on a cash basis. It was contemplated at first to declare a Store Company dividend sufficient to liquidate the indebtedness of Lee, as well as the indebtedness of testator, a dividend of approximately $150,000. Upon being informed by the auditor and ascertaining that such a dividend would result in prohibitive surtaxes, it was finally determined to declare a dividend of $50,000 which was used, in part, to liquidate Frank's indebtedness and reduce Lee's indebtedness to $20,000. Plaintiffs complain that this $20,000 has never been collected from Lee and that he has paid no interest thereon. Prior to Frank's death the brothers never charged the Store Company interest on credits standing to their individual accounts, and they never, through the Store Company, charged each other with interest on their individual withdrawals from the undivided profits standing to the credit of the Store Company. Lee would have been entitled to have his indebtedness discharged in like manner as Frank. It clearly appears that the failure to discharge Lee's indebtedness at the time Frank's was discharged was to the advantage of the trust estate. The testimony is to the effect that Lee is a man of affairs; his wealth being estimated at $300,000, consisting in part of his holdings in the Store Company (which still has an undivided profit in excess of $200,000). The preexisting policies of the brothers in the conduct of their business enterprises has been *Page 134 
continued by the trustees; and we gather from testator's will he so desired. The record does not disclose that Lee has withdrawn his total income from the business enterprises of the Shelton Brothers; and there has been no segregation of interests. This may be of benefit to Lee. If so, it should also benefit the trust estate. Lee's share of the undivided profits of the Store Company exceeds his indebtedness to the Store Company. The Store Company account has been drawn on to meet advancements made to Frank's beneficiaries. Under the circumstances the handling of Lee Shelton's indebtedness to the Store Company does not call for the removal of the trustees.
[7] (b) Plaintiffs next complain of the sale of one hundred twenty acres of land at $150 an acre. The will authorizes the trustees "to sell . . . any part of said property upon such terms or conditions as said trustees . . . may deem advisable for the best interests of my estate. . . ." There was some hearsay testimony to the effect testator had refused $200 an acre for the land, but the same witness was of opinion $150 an acre was a good price. There was other testimony that the land brought more than it was worth at the time of sale. The land was the property of the Store Company. If sold for less than its value Lee Shelton sustained a loss.
(c, d) William Frank Shelton owned the controlling interest in the Bank of Kennett at the time of his death and Lee Shelton was the next largest stockholder. Plaintiffs say shares of stock were sold over the protest of Ruby Shelton so that Lee could secure control; that the trustees refused to elect Ruby Shelton a director; and that five shares of stock were placed in the name of McHaney and he was elected a director. The testimony was to the effect that in 1930 on account of financial conditions then existing it became necessary to rehabilitate and reorganize the bank; that Frank Hunt, vice-president of the First National Bank in St. Louis, was called in consultation; that he recommended enlarging the Board of Directors from five to seven and securing men who would take an active part in the management; and that after conferences J.D. Spence and T.H. Masterson each purchased five shares for $300 a share from the trust estate and were elected directors. We are unable to find that said stock did not bring full value. Lee Shelton acquired no stock from the trust estate and does not own a majority of the stock. McHaney testified he did not solicit the directorship but was selected at the suggestion of Mr. Hunt. He gave a $1500 demand note to the trustees of the trust estate for the five shares placed in his name. This note contains a provision providing for payment upon the return of the stock and all dividends. The dividends have been turned over to the estate. McHaney's election and service on the board has been with the understanding he was assisting and looking after the interests of the trust, estate. There is no showing that he has been derelict in this. Under the statutes of this State [Secs. 5363, 5364, R.S. *Page 135 
1929] he, as contended by plaintiffs, may not have been legally qualified for the directorship he holds; the statutes requiring ownership in one's own right of shares sufficient to qualify. The beneficial interest in this property is in the beneficiaries, but if William Frank Shelton intended that the beneficiaries were to have control and management of the property it was wholly unnecessary for him to have created the trust estate and placed the control and management thereof in designated trustees. Testator had confidence in the ability and integrity of his associate in business affairs for years, as well as the other trustees. These transactions do not establish a violation of or dereliction in faithfulness to testator's confidence in the trustees.
[8] (e) H.S. Wells was dismissed from the service of the Shelton Store Company and McHaney was named secretary to discharge a portion of the duties formerly performed by Wells. There is ample evidence that the services of Wells were no longer needed. The minutes of the Store Company show $3000 was paid McHaney for services as counsel and secretary. This is the $3000 item hereinbefore discussed; but plaintiffs say McHaney received this $3000 for services as secretary. McHaney asked no compensation for services as secretary and his legal services stand established as reasonably worth $3000. The greater weight of the evidence is against plaintiffs' contention.
(f) Plaintiffs next complain of the sale of one hundred twenty shares of J.R. Bissell Dry Goods Company stock at $125 a share. There was hearsay testimony that in 1926 or 1927 testator stated he did not want to sell the stock. The trustees sold the stock because they knew nothing about the wholesale dry goods business and were removed from the company's location. There was testimony that the stocks paid dividends of 15% in 1929, 10% in 1931 and 20% in 1933; that at the time of the sale the book value of the stock was $140, although the trustees figured the book value at $125; and that "things were pretty hard with the company." However, the company succeeded in collecting all but 4% of $175,000 it then had outstanding on its books. Defendants' Exhibit 67, a financial statement of the Bissell Company, is not incorporated into the record; and it is not established that the trustees exceeded their authority or sacrificed the stock; especially if the sale occurred prior to the declaration of the 1933 dividend.
[9] (g) During his lifetime testator had a "riding boss," as they are designated in the cotton country, paying him $150 monthly. The trustees employed a party to render this service in the management of the approximately 10,000 acres of land which the trust estate owned or had an interest in, paying $125 monthly therefor and charging the same against the accounts of the trust estate, the Store Company and Shelton Brothers. We shall not go into the details of the services rendered. He exercised no functions of management *Page 136 
but worked under the directions of the trustees. The employment of a "riding boss" was certainly within the spirit of the testator's will.
[10] V. Plaintiffs' brief makes a general complaint against the expenditures for counsel fees and to physicians who testified as expert witnesses in the defense of a suit [Shelton v. McHaney,338 Mo. 749, 92 S.W.2d 173] to set aside testator's will. With the exception of Ruby Shelton, plaintiffs here were the parties plaintiff in the will contest; and Ruby Shelton although named as a party defendant in the will contest was, in effect, also a contestant [Ibid., l.c. 754 and 173, respectively]. A short time before the execution of the will testator had been informed by physicians he had multiple myeloma, a rare but fatal disease, and only a short time to live. One of the grounds for setting aside the will was testator's alleged mental incapacity occasioned by disease and mental and physical deterioration. Testator's will expressly provided "Seventeen. This will has been carefully planned by me and it is my deliberate judgment that all of its provisions are wise and just and that the plan as a whole will prove beneficial and satisfactory to my wife and family. . . ." As indicated by this record and stated by this court in upholding testator's will: [Ibid., l.c. 770, 183, respectively]: "Testator was a man of strong mind and character, an experienced and able businessman, a man not easily influenced to act against his judgment or to abandon a purpose he had determined upon." Ruby Shelton in a letter written in September, 1930, speaking of testator's will, stated: ". . . I think Mr. Frank's mind worked with its old methodical coolness. The habits of a lifetime are hard to break." Testator, no doubt, during his lifetime would have resisted any attempt to declare him incompetent and likewise would have desired his legal representatives to resist any effort to have him declared mentally incompetent to execute his last will and testament. The will by broad general powers seeks to substitute the trustees in testator's place and stead as nearly as practicable. Upon advice of counsel, the proponents of the will secured physicians recognized as authority on mental conditions and who had made or were requested to make a study of the effect of the uncommon disease of multiple myeloma on the mind. Conferences were had with these witnesses and they were in attendance for several days at the trial, which lasted three weeks, that they might be available for necessary consultations during its progress. These facts differentiate this case from the Missouri cases cited by plaintiffs, viz., Burnett v. Freeman,125 Mo. App. 683, 103 S.W. 121, 134 Mo. App. 709, 113 S.W. 488; State v. Bell, 212 Mo. 111, 126 (III), 111 S.W. 24, 28 (3); and Klepper v. Klepper, 199 Mo. App. 294, 300 (II), 202 S.W. 593, 595 (4, 5), which are to the effect expert witnesses are not entitled to compensation in addition to regular witness fees for services as a witness but *Page 137 
may legally receive such compensation for other services performed in connection with their testimony [see 70 C.J., pp. 75-77, secs. 86-88]. We find no testimony directed toward overpayments. Rather, plaintiffs say the experts were not entitled to extra compensation or that these matters, especially the counsel fees, should have been submitted to the proper tribunal for approval or determination before actual payment. [See Trauz v. Lemp, 334 Mo. 1085, 1094(1), 72 S.W.2d 104, 107 (1)]. Trustees are not necessarily removed for each mistake of judgment or even breach of trust. A tribunal might well find, so far as disclosed by the instant record, that considered as a whole the payments were made in good faith, according to law and reasonable under the circumstances; and, with propriety, we may not direct the removal of the trustees for making them. If in an individual instance or two the trustees have overstepped the law or the discretion vested in them, plaintiffs have an adequate remedy.
[11] VI. Plaintiffs also urge the removal of the trustees because, they say, (a) Lee Shelton's interests are antagonistic to the interests of the cestuis; (b) because Lee Shelton is intemperate in his indulgence of intoxicating liquor to such an extent as to incapacitate him in the discharge of his duties as trustee; and (c) because the trustees are hostile to the beneficiaries.
(a) At the time testator created the trust estate he had full knowledge of the business relationship existing between himself and his brother in properties involved in the trust estate. Testator's selection of Lee Shelton must have been prompted by testator's knowledge of Lee's familiarity with the property and their joint affairs, and his confidence in Lee's ability and integrity. The instant record indicates the trustees have conducted these business interests along the same lines they were transacted during testator's lifetime.
(b) Lee Shelton admits he "drinks." There is testimony pro and con on the extent of his indulgence. The vast preponderance of the probative testimony on the issue refuted plaintiff's contention. The record establishes him as a man of property, having the confidence of his business associates (as he had of testator) and occupying from time to time places of trust and confidence in the community.
(c) Plaintiffs' argument under this point sets forth twenty incidents or acts of hostility for which they urge defendants' removal. Many are of a trivial nature. Others plaintiffs affirmed and defendants denied or explained; and as to these we are not disposed to disturb the conclusions of the learned chancellor nisi who was in a better position to weigh the probative value of the evidence. The more important are disposed of by the rulings hereinbefore made. In several instances plaintiffs must have considered the questioned action of little consequence as they failed to incorporate in their abstract supporting exhibits referred to in their argument. *Page 138 
Testator had been receiving a salary aggregating $20,000 annually for a number of years prior to his death; and from plaintiffs' testimony we understand testator paid Edith Shelton $250 monthly, and made monthly allowances to Bill of $500 and to Ruby Shelton of $1,000, in addition to meeting the ordinary expenses of his household et cetera. The trustees, not receiving this annual income, have continued the payments to Edith Shelton and have made monthly allowances to Bill, with the exception of the time Bill was using the proceeds of the insurance policy, of not less than $175 and monthly allowances to Ruby Shelton of not less than $500. Testator resided in Kennett, Missouri. The trustees so managed the estate as to promptly pay all taxes, Federal and State, arising out of testator's gifts, as well as general taxes, the expenses of administration and of hotly contested litigation, the overhead charges of the businesses in which testator was interested and the above-mentioned allowances during periods of business depression and droughts. We are in accord with the rulings, under the facts involved, in Gartside v. Gartside, 113 Mo. 348, 354(II), 20 S.W. 669, 670(2); Gaston v. Hayden, 98 Mo. App. 683, 690(II), 73 S.W. 938, 940(2); and the observations in Selleck v. Hawley, 331 Mo. 1038, 1058(12),56 S.W.2d 387, 396 (21-24). But, viewing the instant administration from first to last as disclosed by the record before us, the trustees appear to have been faithful to their trust and have not permitted business disagreements or personal unfriendliness with any of the cestuis (which they deny exist on their part) to interfere with a bona fide effort to conserve the trust estate for testator's beneficiaries or the discharge of their duties in accord with the spirit and letter of testator's will, although in one or more individual instances they may have made mistakes of judgment or proceeded other than in the most approved manner or even in accord with due process. The cestuis
desire their removal. Ruby Shelton was kept informed of the provisions of the will as it was being drafted. [Shelton v. McHaney, 338 Mo. 749, 759 et seq., 92 S.W.2d 173, 177 et seq.]. A suit was instituted to set the will aside, and from this record we understand counsel for contestants in the will case was counsel for Ruby Shelton at the time. As executors these trustees made final settlement of testator's estate; and the exceptions of plaintiffs thereto, questioning items totaling approximately $38,000 and resulting in the disallowance of a $600 item only, may be found reported in Re Shelton's Estate, 338 Mo. 1000,93 S.W.2d 684. The chancellor may have considered such hostility as the record discloses to have had its inception in the failure of the expectations of the cestuis, or some of them, to receive greater allowances than the trustees, under their discretionary powers, saw fit to make, and to have been accentuated by the adverse results of the litigation, unsuccessful in the main, instituted on behalf of the cestuis. We are dealing with trustees appointed by the creator of *Page 139 
the trust after personally securing their consent to serve. The trust estate was created after mature deliberation and the trustees are men with whom the trustor had been associated in business and in whose business ability he had confidence. Thecestuis take under testator's will. They may not escape the conditions there imposed or avoid testator's preference of trustees to administer his estate without just and sufficient cause. Testator's desires, as well as the desires of thecestuis, are to be considered. This is forcibly illustrated by the history of the instant estate, for the cestuis would have had testator declared mentally incompetent to make his will. It is not for us to, nor may we, considering the provisions of the will and the record as a whole, say he acted unwisely. Mere hostility between trustees and cestuis is insufficient in law to require the removal of trustees [Lowe v. Montgomery,117 Mo. App. 273, 277, 92 S.W. 916, 917; the Gartside and Gaston cases, supra, and annotation 45 A.L.R. 331]. Loyalty of trustees to the trust may produce disagreements with cestuis and enmities on the part of the cestuis not shared by the trustees. We consider the instant record does not establish that these alleged grounds for removal have or will probably result in a lack of fidelity by defendants to their trust or endanger the trust estate.
VII. Other points briefed by plaintiffs relate to charges of fraud connected with the procurement of testator's will. They were considered in Shelton v. McHaney, 338 Mo. 749, 755 et seq.,92 S.W.2d 173, 174 et seq., and we ruled, speaking through COOLEY, C., that the charges were not supported by substantial evidence. The instant record does not present facts calling for a different result.
The judgment is affirmed.