59 So.2d 914

**FIRST NAT. BANK OF BIRMINGHAM et al. v. INGALLS.**

6 Div. 193.

Supreme Court of Alabama.

June 26, 1952.

Cabaniss & Johnston, Birmingham, for appellant First Nat. Bank of Birmingham.

Lange, Simpson, Robinson & Somerville, Reid B. Barnes, and Jas. A. Simpson, all of Birmingham, for appellant Ellen Gregg Ingalls.

Chas. W. Greer and Francis H. Hare, Birmingham, for appellee.

538

STAKELY, Justice.

Robert I. Ingalls, Jr., as trustee and as beneficiary of a trust indenture, referred to in the record as Trust A, instituted this suit in the Circuit Court of Jefferson County, Alabama, Equity Division, to remove The First National Bank of Birmingham as cotrustee of the foregoing trust estate. The trustees administering the estate were Robert I. Ingalls, Jr., The First National Bank of Birmingham and Mrs. Ellen Gregg Ingalls. Originally Robert I. Ingalls, Sr., had been one of the trustees, but he resigned as trustee and The First National Bank of Birmingham was appointed to succeed him on January 2, 1946 in conformity with the provisions of the trust indenture, which expressly designated The First National Bank of Birmingham to be the successor trustee in such a situation. The theory of the bill is (1) that The First National Bank of Birmingham had willfully refused to distribute to the beneficiary Robert I. Ingalls, Jr., income from the estate as required by the provisions of the trust indenture and (2) that The First National Bank of Birmingham in allowing its vice president and trust officer to vote as proxy at the annual meeting of the stockholders of Ingalls Iron Works Company in February 1949 acted in violation if its duties as trustee. It is contended that hostility and inharmonious relationship between the cotrustees is also made an issue in the case. We shall consider this last contention later.

The First National Bank filed an answer to the bill. Mrs. Ellen Gregg Ingalls, who was made a party respondent but whose removal as trustee was not prayed for in the bill, demurred to the bill of complaint. When her demurrer was overruled she answered denying the allegations of the bill. After an oral hearing before the court, the court removed all of the trustees of Trust A including Robert I. Ingalls, Jr. The First National Bank of Birmingham and Mrs. Ellen Gregg Ingalls have prosecuted this appeal. We think it well at this point to show the allegations of the bill which set up the two theories, numbered (1) and (2) respectively, to which we have referred.

"Complainant says that the respondent The First National Bank as said Trustee and as said managing trustee, has wilfully, defiantly, unlawfully and in direct contradiction of said implicit provision of said trust instrument, refused to pay over to the said Robert I. Ingalls, Jr. any sums whatever out of the proceeds of said trust estate although the said Robert I. Ingalls, Jr. has, during the years 1948 and 1949, repeatedly requested it so to do.

"Complainant further says that the action of the respondent, The First National Bank, in joining with the said Ellen Gregg Ingalls in the execution of said proxy to the said Zukoski and in authorizing the said Zukoski to vote the said stock belonging to said Trust A for the removal of Robert I. Ingalls, Jr., as beneficiary under said trust from the board of directors of the said Ingalls Iron Works Company was over the objection and protest of the said Robert I. Ingalls, Jr., and was in wilful defiance of the provisions of said Trust A, that so long as the three original trustees should administer the trust thereby created the decision of any two of them should govern in all cases where all the trustees were unable to agree, and constituted a wilful and malicious refusal to follow the clear instructions of the creator of said trust as expressed in said trust instrument."

Certain facts which form the background of the present controversy and which are undisputed should be understood. The Ingalls Iron Works Company was organized in 1909 by Robert I. Ingalls, Sr. The bulk of the assets of the trust which is here involved consists of shares of the capital stock of the Ingalls Iron Works Company. Ever since its organization Robert I. Ingalls, Sr., has been the managing head and chief executive officer of the company. The company has grown and prospered. For approximately ten years before the filing of this suit the company paid annual dividends of $5 per share on its outstanding shares of capital stock and since its organization has accumulated assets of millions of dollars.

The trust involved in this suit was created in 1932 by Robert I. Ingalls, Sr. The trust assets consisting of 1,000 shares of common capital stock of Ingalls Iron Works Company and 1,800 shares of common capital stock of Security Realty and Investment Company were conveyed to the trustees by Robert I. Ingalls, Sr., as grantor. This trust is referred to as Trust A to distinguish it from the other so-called Ingalls Trusts. In later years there were created additional trusts known as Trusts B, C, D, E, F and G, all of which hold shares of common capital stock of Ingalls Iron Works Company and all of which, other than Trust D, were created by Robert I. Ingalls, Sr., or his wife Ellen Gregg Ingalls, as grantors. Trust D was created by Robert I. Ingalls, Jr., as grantor. The beneficiaries of Trust A are named as Mrs. H. P. Ingalls, the mother of Robert I. Ingalls, Sr., Ellen Gregg Ingalls, the wife of Robert I. Ingalls, Sr., and Robert I. Ingalls, Jr. Each of these beneficiaries was given an interest for life. Following their deaths, the trust estate is to be held for the benefit of the lineal descendants of Robert I. Ingalls, Jr. All of the other trusts name as beneficiaries the children or lineal descendants of Robert I. Ingalls, Jr.

Until early in 1948 there were no disagreements or difficulties in the administration of any of these so-called Ingalls Trusts and no controversy of any kind arose in connection therewith. Until that time relations between Robert I. Ingalls, Sr., and Robert I. Ingalls, Jr., appear to have been harmonious and pleasant. In May 1948 there was a serious disagreement between father and son which culminated in the father causing the son to be discharged as president of Ingalls Iron Works Company and as an officer of the various subsidiary corporations. Thereafter there followed a multiplicity of legal and equitable actions instituted by the son against the father.

Since the court removed as trustees both The First National Bank of Birmingham and Ellen Gregg Ingalls and each has ap-

pealed from the ruling, we shall first consider the case as it relates to The First National Bank of Birmingham and then consider the case as it relates to Ellen Gregg Ingalls.

I. While The First National Bank of Birmingham interposed no demurrer to the bill, it should be pointed out at this point of the discussion that taking the allegations of the bill as true, the bill states a case in either aspect of the bill against the bank as trustee. In either situation set forth in the bill, a sufficient violation of the trust is shown and the bank would not be a suitable person to serve as trustee and would fall within the ban of the statute. § 65, Title 58, Code of 1940. As pointed out in Ex parte Jonas, 186 Ala. 567, 64 So. 960, the statute is substantially a declaration of the law as it existed, so far as it concerns the powers of an equity court after such court has assumed jurisdiction of a trust estate. In this connection we refer to the following general statements of the law.

"Before the court will order removal, some cause must be shown why the trustee ought to be removed." Bogert, Trusts and Trustees, § 527.

"A court which has supervision over the administration of trusts has power to remove a trustee for proper cause * * *. If the court of first instance orders the removal of a trustee without sufficient reason * * * the appellate court will reverse its action." Scott on Trusts, § 107.

"It is certainly competent under some circumstances for a court of equity to remove an old trustee and appoint another in his stead * * * but the bill in the present case contains no allegation against the trustees * * nor is there anything in the record to show that they have not acted with entire propriety or that they are unfit persons to execute the trust." Chambers v. Mauldin, 4 Ala. 477.

Until the disagreement between Robert I. Ingalls, Sr., and Robert I. Ingalls, Jr., there had been no controversy of any kind about the administration of the trusts and Robert I. Ingalls, Jr., received funds from the trust whenever he requested that such funds be made available to him. From the time Robert I. Ingalls, Jr., had his disagreement with his father in May 1948 he made no written request for distribution of funds from Trust A until March 1949, but there are tendencies of the evidence to show that verbal requests were made during the latter part of 1948 and in the early part of 1949. Letters were introduced in evidence which passed between The First National Bank of Birmingham and Robert I. Ingalls, Jr., which constitute the basis of the charge against the bank now under consideration. We set these letters out chronologically and their respective dates. Charles Zukoski was at the time of the letters the Vice President and Trust Officer of The First National Bank of Birmingham.

"March 15, 1949

"Dear Bob:

"We have some cash to invest in the above trusts. The trustees should reach a decision as to how the money should be invested and for that purpose I would appreciate having you come by my office at your convenience to give me your views. Please call me in advance so that I can arrange to be on hand.

"Sincerely yours

Charles Zukoski, Jr.

"March 31, 1949

"Dear Mr. Zukoski:

"I have your letter of March 15th, 1949, relative to the cash on hand in the above Trusts. You request my views as to how the money should be invested.

"It occurs to me that consideration should be first given to a disbursement of whatever is necessary out of the cash on hand as benefits to the beneficiaries, as is contemplated by the Trusts and as has been done in the past until recently.

"Yours very truly,

Robert I. Ingalls, Jr."

The Bank's reply to the foregoing letter so far as pertains to Trust A is as follows:

"April 14, 1949

"As to Trust A, the matter of distribution of income does not depend upon any discretion of the trustees and there is no reason why you should not receive on request that part of the net income of the trust which is directed to be paid to you. There are only two things which, as I see it, should be considered before the distribution is made, and these I would suggest be handled as follows:

"(1) The trustees have made to your grandmother, Mrs. H. P. Ingalls, during her lifetime, and to Mrs. Grace I. Swann since her death, distributions in the sum of $5,880.24 in excess of the annual distribution of $1500 which the instrument directed to be made to your grandmother during her lifetime. These payments were undoubtedly made with the approval of all members of the family, but the trustees should have for their file an instrument in writing signed by both of the remaining beneficiaries, your mother and yourself, approving these excess payments out of the income from the trust otherwise distributable to them.

"(2) There is not enough income cash in the account to pay to both you and your mother all of the income accumulated for both of you. This is the case because of the fact that some of the income of the trust has been used to take care of premiums on certain insurance policies on the life of Mr. Ingalls constituting assets of the trusts and to purchase other investment items. In order for the trustees to distribute to you and your full share of the cash, remaining after the excess payments to your grandmother, it will be necessary for your mother to agree to defer payment to her of her share of the income until one or more of the insurance policies on Mr. Ingalls' life mature. We believe that your mother will agree to this deferment in consideration of interest on the balance at the rate of 3% per annum, until paid. We would like to have your approval of this arrangement.

"Upon receipt of a letter from you agreeing to these two steps in connection with Trust A, the trustees will distribute to you a check covering your one-half share of the income balance. We will also set up our records so that income will in the future not be invested and so that income will be distributed to the two beneficiaries at least once annually."

To the above letter Robert I. Ingalls, Jr., did not reply. On April 16, 1949 the trustee wrote to Mr. Ingalls as follows:

"Since writing you with reference to Trust 'A', I have been advised by Mr. Pixton that two of the policies on the life of Mr. Ingalls in that trust will mature on April 21, 1949 and will make available for the trust, with cash already on hand, an amount sufficient to pay both you and your mother the income balances due you from the trust. This eliminates the second question with respect to this trust mentioned in my letter, so that the only thing I need from you before making the distribution is your approval of the distributions totaling $5,864.00 previously made from income to Mrs. H. P. Ingalls or for the account of her last illness and funeral.

"If you will write me waiving any claim to the income so distributed for your grandmother, I will arrange with Mr. Pixton to proceed immediately with distribution to you of your one-half share of the remaining accumulated income of this trust, on or shortly before April 21."

"May 20, 1949.

"Dear Bob:

"I have at hand check of the Provident Mutual Life Insurance Company in the sum of $10,294.00, payable to the order of the trustees of Trust 'A', which represents the proceeds of the policy we have been in process of collecting to provide the cash for income distributions from this trust. Please come by at your early conven-

542

ience to endorse this check as one of the trustees so that we can proceed with collection and distribution.

"You will recall that I have also asked you to advise us whether or not you are willing to have deducted from the distribution the amount advanced to your grandmother and her estate."

The next letter from Robert I. Ingalls, Jr., to the bank is a registered letter dated May 20, 1949, but delivered May 24, 1949.

"Gentlemen:

"Re: *Trust 'A' 3130*

"I call your attention to the following provisions which appear in the trust indenture above referred to:

"(c) 'The trustee shall hold said trust estate in trust for the payment out of the net income therefrom of $125.00 per month to the grantor's mother, Mrs. H. P. Ingalls, of Huntsville, Ohio, so long as she may live, and after making said payments currently, one-half thereof out of the income of each share for the equal use and benefit of the grantor's wife, Ellen G. Ingalls and the grantor's son, Robert I. Ingalls, Jr. * * *

" 'During such period the trustees shall transfer and pay over to the grantor's said son the entire net income from his share of said trust estate.' Despite the foregoing provisions of the trust indenture, which leave nothing to the trustee's discretion so far as disbursing the net proceeds of the estate is concerned, the bank has disregarded repeated requests made by me during the past several months for payment to me of the income from this trust estate, while admitting there is on hand ample funds for disbursement. This, although the bank is well acquainted with the fact that I have received no compensation from the Ingalls Iron Works Company or from the Ingalls Shipbuilding Corporation for over a year and that my children have received nothing from the various trust estates of which the bank is a trustee for many months.

"Conduct of this kind on the part of the bank, together with its partisan activities in behalf of my father in consummating his plan to wreck me financially has led me to the conclusion that the bank is no longer qualified to administer Trust A with that impartiality which should characterize the conduct of all trustees.

"I am therefore writing this letter to request that the First National Bank of Birmingham resign immediately as a trustee under this trust and notify you that unless action is taken I shall institute suit to have the bank removed as such trustee.

"Yours very truly,
"Robert I. Ingalls, Jr."

The next letter was from The First National Bank of Birmingham to Robert I. Ingalls, Jr., dated May 24, 1949 and is as follows:

"Re: Ingalls Trust A–T.D. 3130

"Dear Bob:

"We acknowledge receipt of your letter of May 20th with respect to the above trust. While you do not say so directly we construe your letter as a reply to that part of my letter to you of April 14, 1949, dealing with Trust A, and to my letters to you dated April 16, 1949 and May 17 and 20, 1949, and as the first expression we have had from you that you are not willing to consent to any deduction from the distributions of income on hand in the trust by reason of distributions heretofore made to your grandmother or her estate for the expenses of her last illness and funeral.

"As I advised you on May 20th, the check necessary for distribution to you and your mother has only just been received from Provident Mutual Life Insurance Company. If, as requested in that letter, you will come by and endorse this check for collection, a remittance for your share will be sent to you as soon as it can be prepared and the necessary signatures obtained. The records of the trust show that as of December 31, 1948, the last account-

ing period, undistributed income stood credited $7,562.43 to your account and $13,962.41 to that of your mother, the difference being accounted for by differences in withdrawals in the past.

"We must deny your charge that the bank has participated in any partisan plan adverse to your interest. The advances made to your grandmother and to her estate and the investment of income of the trust in insurance were, so far as we previously knew, made with your approval and consent. As soon as we ascertained that you wanted distribution of the income, we recognized fully your right and took steps to bring the distribution about. The delay since that time has simply been that necessary to collect the cash required to make distribution and to determine your position with respect to the advances to your grandmother.

"We will continue to administer the trust impartially and with full regard for the interests of the beneficiaries."

The next letter was from Mr. Zukoski to Robert I. Ingalls, Jr., dated May 26, 1949, and is as follows:

"Re: Ingalls Trust A–T.D. 3130
"Dear Bob:

"This will confirm our telephone conversation of today in which we discussed the distribution to you of the income of the above trust.

"I advised you that as a result of your endorsement of the check of Provident Mutual Life Insurance Company which you signed today, we had available in the trust the funds with which to make the income distribution. I advised you further that I expected to mail you today a check in the sum of $7,562.43 covering your share of the undistributed income of the trust to December 31, 1948. You stated that you had not yet finally made up your mind with respect to the deduction from your share of the income of the advancements previously made by the trustees to your grandmother and her estate, and that for that and other reasons you preferred to have us defer the distribution. You asked me therefore not to mail you the check but to hold it until you have reached your decision which you expected to make within the next few days.

"I have the check to your order on my desk and will be glad to distribute it to you at any time you request it. In the meantime please consider this final question and advise me of your decision. Should you decide to accept the deduction of the advancements to your grandmother a new check for the adjusted amount can, of course, be immediately drawn."

We set out the next letter dated June 6, 1949, as follows:

"Re: Ingalls Trust A–T.D. 3130

"Reference is made to my letter to you dated May 26th. We are still holding the check to your order in the sum of $7,562.43 which we will be glad to deliver to you at any time you request. Please let us hear from you at your early convenience."

The final letter in the series of letters passing between the First National Bank of Birmingham and Robert I. Ingalls, Jr., dated June 30, 1949, is as follows:

"Re: Ingalls Trust A–T.D. 3130
"Dear Bob:

"Reference is made to our two letters to you dated May 26th and June 6th, concerning the check to your order in the sum of $7,562.43, which we have been holding awaiting your instructions. While you have not yet advised us your decision with respect to the deduction from your share of income of the trust for advancements previously made by the trustees to your grandmother and her estate, Mr. Pixton has told me of your conversation with him on Monday, June 27th, in which you stated to him that you had decided not to agree to the deduction.

"We are accordingly sending to you herewith the check for $7,562.43 covering your share of the undistributed income of the trust to December 31, 1948. Remittances covering subsequent income will be sent to you

544

periodically in the future."

We do not consider that on the foregoing evidence it can be said that The First National Bank of Birmingham as trustee willfully, defiantly and unlawfully refused to make distribution to Robert I. Ingalls, Jr., as a beneficiary of the trust estate. It is true that under the provisions of Trust A The First National Bank of Birmingham as cotrustee was obligated to distribute to the beneficiaries the net income of that trust estate whether any demand of any kind was made by the beneficiary or not. But a fair consideration of the contents of the letters does not show that the bank undertook to impose any condition with respect to distribution but simply sought his formal assent to deduction from disbursement of the amount advanced by the trust to his grandmother and her estate on account of expenses of her last illness and funeral expenses. She was also a beneficiary of Trust A. The bank had considered that these payments had the approval and consent of all members of the family.

Under date of May 26, 1949 Robert I. Ingalls, Jr., himself requested the bank not to send him a check for his distributive share but to hold the check until he made up his mind. The telephone conversation referred to in this letter was not denied by Robert I. Ingalls, Jr. And it was not until June 30th, thirteen days after the filing of the bill in this case that the bank learned, not directly from Robert I. Ingalls, Jr., but indirectly that he had finally concluded that he would not agree to be liable for any part of the distributions so made to or for the account of his grandmother. When the bank learned that Robert I. Ingalls, Jr., was unwilling to accede to the deduction and as soon as it had on hand a sufficient amount for distribution, it immediately took steps to make the distribution. In the letter of May 20th the bank's representative said: "You will recall that I have also asked you to advise whether or not you are willing to have deducted from the distribution the amount advanced to your grandmother's estate." Do these words in any way indicate that the bank was imposing a condition? It does not seem so to us. Was there hostility or ill feeling on the part of the bank toward Robert I. Ingalls, Jr.? The letters do not indicate any such situation. In fact on cross-examination Robert I. Ingalls, Jr., testified as follows:

"Q. Mr. Ingalls, your relations with the bank have been friendly and pleasant? A. We have been friendly, yes, sir.

"Q. Have your communications with Mr. Zukoski on various matters in connection with these trusts always been on a friendly basis? A. Mr. Zukoski has always been friendly and courteous with me in these business matters."

In considering the matter under discussion it is well to understand that Robert I. Ingalls, Jr., was not only a beneficiary but also a cotrustee with a trustee's responsibility. It is difficult to see anything improper in the attitude of The First National Bank of Birmingham and Ellen Gregg Ingalls in their effort to straighten out the overdraft allowed to Mrs. H. P. Ingalls. When the death of Mrs. H. P. Ingalls in 1947 stopped further accruals to her from the trust, the trustees, including Robert I. Ingalls, Jr., were confronted with a problem of an overdraft. The trustees were under no obligation whatever and it would have been improper for them to have disbursed to a demanding beneficiary or cotrustee the full amount which would have accrued to him on the basis of there having been no overdraft to Mrs. H. P. Ingalls, where the trust was already over $6,000 behind in the disbursement due to another beneficiary and cotrustee, Mrs. Ellen Gregg Ingalls. It is not unreasonable that The First National Bank of Birmingham and Mrs. Ellen Gregg Ingalls as provident trustees sought to straighten this matter out before further disbursements occurred.

We are clear to the conclusion that on this aspect of the case there is failure of proof necessary to justify removal of The First National Bank of Birmingham as trustee.

II. We come now to the alleged willful and malicious action of The First National Bank of Birmingham in joining with Ellen Gregg Ingalls in the execution of a proxy to Charles F. Zukoski and authorizing him to vote the stock of Ingalls Iron Works Company held in Trust A in violation of the provisions of the trust indenture. At the meeting at which the stock was voted, it was so voted as that Robert I. Ingalls, Jr., was not re-elected to the board of directors of the company. In order to interpret the action of the bank we should go back to a meeting of all the trustees of the Ingalls Trusts in December, 1948. At this meeting the trustees of the various trusts discussed the giving of proxies to vote the shares of stock in the Ingalls Iron Works Company at the annual meeting of the stockholders scheduled to be held on January 11, 1949. In connection with this meeting the president of The First National Bank of Birmingham advised Robert I. Ingalls, Jr., and his counsel that while the bank intended to keep an open mind, it was the then intention of the bank in its capacity as trustee to cause its proxy to be voted so as to keep the then existing management in charge and control of the company.

When action was finally taken at a meeting of the stockholders of Ingalls Iron Works Company, such action had only to do with the election or not of Robert I. Ingalls, Jr., as a member of the Board of Directors of Ingalls Iron Works Company. Previously and without participation by the bank in the action he had been removed as an officer of the company. The bank was confronted with the necessity of determining whether it was to the best interest of Ingalls Iron Works Company and accordingly of the trusts to have Robert I. Ingalls, Jr., serve on the Board of Directors of the company. The bulk of the assets of the trusts consisted of shares of capital stock of Ingalls Iron Works Company. At the meeting of stockholders Charles F. Zukoski stated the views of the bank in this regard as follows:

"The position of the Bank as one of the Trustees of the several trusts which I am representing at this meeting is.

that the personal conflicts which have developed in the Ingalls family may prove injurious to the conduct of the business, hence injurious to the interests of the several trusts owning stock in the corporation, and that the best interests of the company and of the several trusts for which we are one of the Trustees can be best served by removing the controversy from the conduct of the affairs of the company, and I think that can best be done by retaining Mr. Ingalls, Sr., who is the founder and developer of the business, and who is best qualified to conduct its affairs, and persons who are harmonious with his management, rather than to continue as one of the directors Mr. Robert I. Ingalls, Jr., who, for whatever reason that may be, has fallen into discord with his father, and who does create a discordant element in the conduct of the business."

The foregoing statement has been considered with care. We see nothing in it to indicate any malicious or willful disregard of duty. The concern of the bank as trustee appears to have been what was in its sound judgment for the best interest of the trust estate. Conceding for the sake of argument that it should have reached another conclusion, we do not think that its action in this matter should be imputed to bad feeling or improper motive. In view of the controversy between father and son, can it be said that it would have been for the best interest of the stockholders of Ingalls Iron Works Company to have Robert I. Ingalls, Jr., carry into the meeting of the board of directors of the company the personal difficulties existing between him and his father? True he was a beneficiary of the trust but so was his mother for her life and the children of Robert I. Ingalls, Jr., are the other beneficiaries of the trust. It was the duty of the bank to determine in its best judgment what was for the best interest of the trust estate in all its aspects rather than what one beneficiary might conceive to be his personal interest. And this was especially true when in the judgment of the bank accordance with the personal wishes

of one beneficiary might result in loss to the trust estate as a whole. In view of the opinion of the bank that the presence of Robert I. Ingalls, Jr., on the Board of Directors óf Ingalls Iron Works Company would not be for the best interest of the trust estate, it would have been a violation of the bank's duty as trustee to have voted to place him on the board.

But it is insisted that the bank should not have joined in the execution of the proxy and should not thereby have authorized the stock in Trust A to be voted. In so doing it is claimed that it violated the provisions of the trust indenture in Trust A. Trust A contains the following provision:

"So long as the three original trustees shall administer the trust hereby created the trustees or any two of them shall govern in any case where all three are unable to agree. In the event there are only two trustees acting the consent and approval of both trustees shall be required in the exercise of any rights, powers, duties and discretion here vested in them."

As has been pointed out The First National Bank of Birmingham under the provisions of the trust succeeded Robert I. Ingalls, Sr., as cotrustee on January 2, 1946. Accordingly one of the original three trustees was no longer engaged in the administration of the trust. At the time of the events here involved the trustees were Robert I. Ingalls, Jr., Ellen Gregg Ingalls and The First National Bank of Birmingham.

■ We have heretofore referred to the meeting of all the trustees of the Ingalls Trust held in December, 1948 and of the statement there made by the president of The First National Bank of Birmingham. Thereafter with knowledge of this attitude on the part of the bank, Robert I. Ingalls, Jr., joined with his mother and the bank in the execution of a proxy authorizing C. F. Zukoski, Jr., an officer of the bank, to vote at such annual meeting or any adjournment thereof the shares of stock of Ingalls Iron Works Company held in Trust A. Although Robert I. Ingalls, Jr., admits that he joined with the other two trustees of Trust A in the execution of the foregoing proxy to C. F. Zukoski, Jr., he testified that he revoked this particular proxy. A careful examination of the evidence however satisfies us that while he did revoke his proxy to C. F. Zukoski, Jr., to vote the stock of Ingalls Iron Works Company in Trust B, he did not revoke the proxy which has been referred to above with respect to the stock of Ingalls Iron Works Company in Trust A.

The result was that when the meeting of January 11, 1949 was held and then adjourned, as will be shown, the bank"s representative held a valid and unrevoked proxy signed by all the trustees of Trust A, though, as will hereafter appear, this proxy was not filed. The holding of the annual meeting of the stockholders of Ingalls Iron Works Company was delayed by reason of an injunction obtained by Robert I. Ingalls, Jr. On the day set for the meeting the only action taken was adjournment of the meeting to a future date because of lack of quorum. A second adjournment was taken when the date arrived which had been fixed at the first adjournment, because the injunction still remained in force and effect and there was still no quorum present. A special meeting of the stockholders of Ingalls Iron Works Company was called to be held on the same date on which was held the adjourned annual meeting. Such special meeting was held immediately following the adjournment of the adjourned annual meeting. It seems that this special meeting, at which identical action was taken as at the adjourned annual meeting, was called because of some contention that there was illegality in the adjournments of the regular annual meeting. The proxy which had been signed by Robert I. Ingalls, Jr., applied only to the regular meeting and any adjournment thereof and did not cover the special meeting. At any rate another proxy signed only by Mrs. Ingalls and the bank was presented at the adjourned annual meeting and at the special meeting in spite of the fact that the bank then held an unrevoked proxy signed by all three of the trustees of Trust A which was valid for the regular annual meeting and any adjournment thereof.

As we have said, it must be remembered throughout this discussion that we are dealing with the removal of a trustee for its alleged willful and malicious action in refusing to comply with the provisions of the trust. We do not consider that mere error of judgment or conduct, even though the same might be a technical breach of trust, is sufficient to meet the broad allegations of the bill or is sufficient to justify removal or discharge of a trustee. Roper v. Roper, 29 Ala. 247; Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550; Shelton v. McHaney, 343 Mo. 119, 119 S.W.2d 951, 54 Am.Jur. p. 112; Shirk v. Walker, 298 Mass. 251, 10 N.E.2d 192, 125 A.L.R. 620, 627. The proxy under Trust B was revoked but the proxy under Trust A was not revoked. The proxy under Trust B was apparently revoked because there were only two trustees in Trust B and clearly unanimous action was required. In Trust A however there were three trustees and if two of the trustees could act, then there was no basis for revocation. There is reason to think from the facts stated that Robert I. Ingalls, Jr., himself at the time was of the opinion that a majority of the trustees could act. He had full knowledge of the bank's views and intentions and if he had thought that unanimous action by all three trustees was necessary, it is not reasonable to think that he would have joined in the execution of the proxy. It is not unreasonable to think that Charles F. Zukoski was of the same opinion. If not, why did he not present the earlier proxy? We are not attempting here to say what should be a correct interpretation of the provisions of the trust, but rather that there is room for such mistake or error, where no question is raised, as to leave the opinion that a majority of the trustees could act when three trustees were functioning. It was unnecessary to provide that where only two trustees are acting the consent and approval of both trustees are required for that would be the law without such provision. First National Bank v. Cash, 220 Ala. 319, 125 So. 28.

The draftsman did not specifically cover the contingency which has arisen in the present case where there are three trustees serving but not the three original trustees.

Since the trust provided that when only two trustees were acting consent of both is necessary, it is not unreasonable to see how the parties could have thought that where three trustees are functioning the majority would control.

The foregoing is borne out by subsequent events. Robert I. Ingalls, Jr., and his attorney were present at the meeting of the stockholders. No question was raised at the meeting by them that the proxy as filed at the meeting was signed by only two trustees. There was objection to the voting of this trust stock, but an examination of the minutes of the meeting and the statements made by the attorney of Robert I. Ingalls, Jr., shows that he was not objecting to the voting of the stock because of any defect in the proxy that was signed, but was objecting to the voting of any and all of the trust stock held in all of the Ingalls Trusts for other reasons stated by the attorneys at the meeting. Besides why should the bank have gone to the point of willfully and maliciously violating the provisions of the trust, when it was not necessary to vote the stock at all in order to keep Robert I. Ingalls, Jr., off the board? The result would have been the same had the vote counted under this proxy not been counted. A majority of the stock voted not to re-elect him to the board, excluding the 1000 shares of stock held in Trust A.

As has been shown Trust A held 1800 shares of the common capital stock of the Security Realty and Investment Company. Charles F. Zukoski under a proxy signed by The First National Bank of Birmingham and by Ellen Gregg Ingalls, two of the three trustees in Trust A, attended the meeting of January 9, 1950 of the stockholders of Security Realty and Investment Company and there voted the stock of that company under the aforesaid proxy. This was nearly seven months after the bill of complaint in this cause was filed on June 17, 1949. The bill of complaint is based on the alleged action of the bank and Mrs. Ellen Gregg Ingalls in joining in the execution of the proxy and authorizing the said Zukoski to vote the stock of the Ingalls Iron Works Company held in Trust A in order to remove Robert I. Ingalls, Jr., from the Board

of Directors of the Ingalls Iron Works Company. We are not impressed with the probative value as to proof of this action in voting the stock of another company, occurring seven months after the filing of the bill of complaint, in its tendency to show a willful and malicious defiance of the provisions of the Trust at the meeting held February 25, 1949.

In a meeting of the Trustees of the Ingalls Trusts held on December 27, 1949 when the matter was under discussion apparently for the first time, while there appeared to be a difference of opinion as to the meaning of the provisions of the trust in question, the view was taken by the attorney for the bank and the attorney for Mrs. Ellen Gregg Ingalls that unanimous action under the terms of the trust did not imply unanimous action in appointing a proxy. Whether the proxy is counted is another matter and that does not arise on the giving of the proxy. According to the minutes of the annual meeting of the stockholders of Security Realty and Investment Company held on January 9, 1950, there was no objection to the voting of the 1800 shares held by Trust A under the proxy to C. F. Zukoski, Jr. But when the annual meeting of the stockholders of the Ingalls Iron Works Company was held on January 10, 1950, and the question was specifically raised as to the right of the two trustees to vote the stock, Mr. Zukoski stated: "Yes, Mr. Chairman, in view of the doubt as to whether I should vote the stock in Trust A, I am not going to vote the stock in Trust A." It can be added the stock held by Trust A in the Security Realty and Investment Company constituted a majority of the outstanding shares of that company and no meeting could have been held without the presence of that stock because of the lack of a quorum. The only action taken at the meeting was a re-election of the directors then serving. A mere failure to attend the meeting would have produced the same result because the directors then serving would have held over until their successors were elected and qualified.

■ We do not think that the position taken with reference to the noncompliance with the provisions of Trust A is such as to show a willful, defiant and malicious refusal on the part of the bank to comply with the provisions of the trust.

■ Furthermore, it is reasonable to consider that the trustees sought to be removed were designated by Robert I. Ingalls, Sr., the settlor of the trust. His business and executive ability through the years played a large and overwhelming part in the creation and development of the business now owned by the Ingalls Iron Works Company and its subsidiaries and the stock held in the trust came from him. A court should be less ready to remove a trustee who was named by the settlor than it might be to remove a trustee named under other circumstances. Scott on Trusts, Vol. 1, p. 561; Restatement of the Law, Trust, 107,f. We feel that in the present instance there should be a strong showing for the removal of trustees named by the settlor and that the court was not warranted in removing as trustee The First National Bank of Birmingham. Nor was the court warranted in removing Ellen Gregg Ingalls, the other trustee named by the settlor, as we shall show.

■ III. Ellen Gregg Ingalls was also removed as trustee of Trust A. Although she was made a party to the present suit, there is no charge of misconduct, loss of confidence in or reflection of any kind upon her, unless it be in connection with her execution of the proxy along with the bank, which has been referred to above. While there was a general prayer for relief, the prayer of the bill seeks no relief specifically whatever against Ellen Gregg Ingalls. In view of the conclusion which we have reached with reference to the action of the court in removing The First National Bank as trustee, we feel that Mrs. Ellen Gregg Ingalls was also improperly removed.

It is doubtful under the pleadings in this case as to whether hostility or inharmonious relationship between the cotrustees is made an issue. Conceding, without deciding, that such an issue is raised by the pleadings, the decree of the trial court would have to be reversed in view of our holding in the case of Ingalls v. Ingalls, ante, p. 521, 59 So.2d 898, to the effect that

the evidence as it bore on this issue was too narrowly limited.

The decree of the lower court is reversed and the cause is remanded as to The First National Bank of Birmingham as Trustee of Trust A and also as to Mrs. Ellen Gregg Ingalls as Trustee of Trust A and the decree of the trial court is also reversed and the cause remanded as to Robert I. Ingalls, Jr., for the same reasons stated in Ingalls v. Ingalls, ante, p. 521, 59 So.2d 898.

Reversed and remanded.

All the Justices concur except FOSTER, J., not sitting.