116 N.J. Super. 491 (1971)
282 A.2d 786
IN THE MATTER OF THE ESTATE OF JULIA HENNING, DECEASED.
Superior Court of New Jersey, Chancery Division.
Decided October 15, 1971.
*492 Mr. Philip S. Carchman for plaintiff (Messrs. Carchman, Sochor & Carchman, attorneys).
Mr. James Logan, Jr. for defendant.
McGANN, J.S.C.
On February 2, 1970 Julia Henning died leaving a last will dated January 12, 1968, wherein she appointed her nephew, Jacques Youssef Khoriaty, executor and guardian of her son. At the time of her death decedent was a resident of Antelias, Lebanon.
After probating the will in Lebanon, an exemplified copy of the same was admitted to probate in this court by an order dated August 12, 1971.
The only next of kin and heir at law of decedent was her son, Philip Ferris, who is disabled.
Before returning to her native country Mrs. Henning had lived in the United States for many years. In her business and legal affairs she was represented by John E. Queenan, Esquire, in whom apparently she had great confidence.
On December 6, 1967 decedent executed a deed of trust appointing Queenan as trustee. The trust res was made up of savings accounts and the balance due on a mortgage covering property formerly owned by her. At the time of her death the trust fund had an approximate value of $30,000 more or less.
In this order to show cause, the executor of decedent's will seeks to have the funds held by Queenan, as trustee, turned over to him on the theory the trust "res" is an asset of the estate because the "trust agreement" was revoked in April 1968, and further urges that the language of decedent's will appointed Jacques Khoriaty guardian of her disabled son Philip, as well as executor of her estate.
*493 Defendant Queenan, in a verified answer to the order to show cause, alleges he held the moneys and assets of decedent under "a Trust Agreement" wherein he was to hold all her assets[*] and pay the income to Julia Henning as requested by her, and upon her death to pay not more than the sum of $100 a month, or whatever lesser amount is earned, from the income of the trust fund to Philip Ferris so long as he lives.
Queenan maintains he has been complying with the terms of the trust agreement. This claim is substantiated by the evidence.
The facts indicate that sometime in the Spring of 1968, Queenan received a call from Mrs. Henning while she was confined in a hospital in Antelias, Lebanon. At that time it appears Mrs. Henning had been talking with Khoriaty, and Queenan's name came up somehow. Thereafter, according to Khoriaty, the settlor called Queenan and said: "I want you to send me my money."
Thereafter a letter was typed, dated April 8, 1968 and purportedly signed by Julia Henning, asking Queenan to "take necessary steps for sending me all the money, and the deal wasn't to put it in the bank."
Queenan also received a call from the State Department concerning Julia Henning and the monies held by him.
Thereafter, in response, the trustee sent a letter to Mrs. Henning, enclosed in a letter addressed to the American Embassy in Beirut, Lebanon, with three checks in the total sum of $26,100.67, with a request that the Embassy have someone from the Consulate deliver the checks to Mrs. Henning.
About three weeks later the American Embassy wrote to the trustee returning the checks and indicating that Mrs. Henning had acted under the influence of her nephew "Jacques Khoriaty," and closed by saying: "Mrs. Henning *494 sends her best regards and asks you to continue looking after her interest."
The letter from the Embassy returning the checks and asking Queenan to continue acting as her fiduciary was dated April 19, 1968. It is interesting to note that the last will and testament of the settlor was dated January 12, 1968.
It is claimed by the executor of decedent's estate that the trust agreement was revoked by reason of Mrs. Henning's communication in March 1968 and the letter to Queenan dated April 8, 1968.
There is no question that decedent had the right to revoke the inter vivos trust during her lifetime. Paragraph 4 of the deed of trust provides as follows:
The Settlor hereby reserves the right to terminate this trust or to modify or amend it at any time or from time to time, by an instrument in writing delivered to the said Trustee during the Settlor's lifetime.
The letter of April 8, if it were written by Mrs. Henning (there is considerable doubt with respect to whether or not it was her own communication) would be sufficient to revoke the trust agreement. In fact, prior to that time there was some communication by telephone or cablegram, followed by a message from the American Embassy to Queenan which he considered as a basis for the forwarding of the trust res with letters of transmittal.
Consequently, when he sent a letter to decedent through the American Embassy on March 29, 1968, he acknowledged this fact. However, the evidence indicates that Mrs. Henning acted under the influence of her nephew Jacques Khoriaty to transfer her funds and revoke the trust. This is borne out by the language of the letter dated April 19, 1968 from the American vice-consul in which all of the funds[**] were returned with the request that Mr. Queenan "continue looking after her interest."
*495 It is clear from the evidence surrounding the attempted recovation that it was never consummated and, at best, was inchoate in nature.
Therefore, there was no evidence to show that a revocation by the settlor was exercised during her lifetime.
In the leading case of Mayer v. Tucker, 102 N.J. Eq. 524 (E. & A. 1928), it was held:
If the right of revocation is not exercised during the lifetime of the donor or other person in whose favor it was reserved, the validity of the trust remains unaffected as though there never had been a reserved right of revocation.
The right to revoke a trust can only be exercised in the manner specified and only by the person to whom the power is given or reserved. Clark v. Freeman, 121 N.J. Eq. 35, 36 (Ch. 1936) citing other cases.
In this case it was urged that the testatrix by her will indicated a desire to, and did by it, revoke the trust. The language of the deed of trust requires that the termination of the same be by "an instrument in writing delivered to the said Trustee during the Settlor's lifetime." The will could not, in the absence of language to the contrary in the deed of trust, be such an instrument in writing because it did not have any legal efficacy until after the death of the testatrix.
The exercise of a power to revoke a trust agreement should be consonant with the terms of the inter vivos trust document.
Restatement, Trusts 2d, § 330, comment (f) at 139, "Where method of revocation specified," provides:
If the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in the manner ro under those circumstances.

* * * * * * * *
If the settlor reserves a power to revoke the trust by a transaction inter vivos, as, for example, by a notice to the trustee, he cannot revoke the trust by will. [Italics added]
*496 The power can only be executed in the manner specified and by the person "to whom the power is given or the attempted revocation is void." See Clark v. Freeman, supra.
Furthermore, from the evidence it is clear that if decedent had any such intention she subsequently changed her mind because the letter from the American Embassy directing Queenan to continue as trustee came after the execution of her last will and testament.
For the reasons stated, it appears the trust agreement was not revoked. A judgment will be allowed accordingly.
NOTES
[*] As described in Schedule "A" of the trust agreement.
[**] The same three checks totaling $26,100.67 were returned.