Mary Joan WEBB, Plaintiff-Respondent,

v.

ST. LOUIS COUNTY NATIONAL BANK, a corporation, Trustee, Richard Marx, Co-Trustee, Defendants-Respondents,

Barnaby Robert Webb, Defendant-Appellant,

Douglas Pierre LaPlante, Defendant-Respondent,

Daniel Ray Webb, Defendant-Appellant,

Ellen Virginia Webb, the Salvation Army, a corporation, Defendants-Respondents,

and

Pearl M. Webb and Executors of the Estate of F. M. Webb, Peter W. Herzog, Jr., and Continental Bank & Trust Company, Intervenors-Appellants.

Nos. 36662, 36663.

Missouri Court of Appeals, St. Louis District, Division Two.

April 26, 1977.

Peter W. Herzog, Coburn, Croft, Shepherd & Herzog, Michael W. Forster, G. Keith Phoenix, Harold C. Hanke, Smith, Hanke & Batts, St. Louis, for appellants.

Jesse E. Bishop, Warren W. Friedman, Albert H. Hamel, Lashly Caruthers, Thies, Rava & Hamel, St. Louis, for respondents.

STEWART, Judge.

This litigation had its origin as an action for declaratory judgment and accounting initiated by plaintiff, Mary Joan Webb with respect to a trust, created by her deceased husband, Robert Webb. Plaintiff will be referred to as Joan. The trust was part of a comprehensive estate plan created by F. M. Webb and Pearl Webb with their son, Robert Webb. Answers and cross-bills of the defendants, Daniel Webb and Barnaby Webb, sought a declaration of invalidity of the trust. Intervenors, F. M. Webb and Pearl Webb also sought a declaration of invalidity of the Robert Webb Trust or alternatively reformation of two trusts which they had created. They also sought the removal of St. Louis County National Bank as trustee of their trusts. The trial court entered its interlocutory decree and inter alia declared the validity of the trust of Robert Webb, declined to reform the trust of F. M. Webb and the trust of Pearl Webb, and denied the prayer for removal of the trustee of the F. M. Webb and Pearl Webb trusts. The court also found that an amendment to Robert's trust deleting the

name of Daniel as a beneficiary was made through a material mistake of fact and restored Daniel's name as a beneficiary in the trust. The court ordered that its interlocutory order be appealable and reserved jurisdiction to award attorney fees. Defendants, Barnaby R. Webb, Daniel Ray Webb and the intervenors, Pearl Webb and the Executors of the Estate of F. M. Webb have appealed from the judgment.

## DRAMATIS PERSONAE

The parties and their relationships are essential to an understanding of the case. Robert Webb, deceased, was the only child of F. M. Webb and Pearl Webb. At the time of his death Robert Webb was married to Mary Joan Webb (Joan), the plaintiff. Douglas Pierre LaPlante, a defendant, is the son of Joan by a previous marriage. Defendants, Barnaby Robert Webb (Barnaby) and Daniel Ray Webb (Daniel) are the sons of Robert Webb by previous marriages. Ellen Virginia Webb Sutherland (Ellen), a defendant, is a daughter of a previous wife of Robert Webb whom he adopted. St. Louis County National Bank (Bank) and Richard Marx are co-trustees of the Robert Webb Trust. The Salvation Army, a remote residuary beneficiary, was also named as a defendant. F. M. Webb was deceased at the time of the trial. Peter Herzog, Jr., and Continental Bank and Trust Co., Executors of the Estate of F. M. Webb, and Pearl Webb were permitted to enter the case as intervenors. These parties will sometimes be referred to as intervenors.

The defendants-appellants contend inter alia that the trust of Robert Webb as amended was invalid because (1) he lacked the mental capacity to create the trust and to amend it; (2) the instrument was a testamentary disposition because the trust did not come into being until Robert's death and (3) it was not treated as a trust by Robert M. Webb and St. Louis County National Bank but as establishing an agency relationship. Defendant, Barnaby Webb,

and intervenors also contend that (4) the court erred in declaring that the interest of Robert Webb's trust in the trust of F. M. Webb's and Pearl Webb's trust qualified for the marital deduction; (5) the trial court erred in failing to reform the trusts of F. M. Webb and Pearl Webb; and that (6) the court erred in not removing St. Louis County National Bank as trustee because it breached its fiduciary duties.

## FACTUAL BACKGROUND

In our review of this court tried case we are required to sustain the judgment of the trial court, "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). With these general principles in mind we review the factual background of this litigation.

Some time prior to October 3, 1966, at the request of F. M. Webb, Virgil O'Connor, an attorney, drew the three trusts which are the subject of this litigation. At the same time he prepared two other trusts [1] and revised the wills of F. M. Webb and Pearl Webb.

The first of the trusts in litigation was the revocable inter vivos trust of Robert Webb. The trust was funded by a deposit of $100.00. In essence this trust made provision for Joan, his wife, as the primary beneficiary. It provides that if Joan survive Robert the trustee would hold and administer as a separate trust, that part of the trust assets that would qualify for the marital deduction under the provisions of the Internal Revenue Code. Joan was given a power to appoint the corpus of this marital deduction trust by her will. The

---

1. These were separate trusts of F. M. Webb and Pearl Webb—each trust was funded with $100.00. The beneficiaries in each of the trusts were Barnaby and Daniel. At the time of trial the value of the corpus of each trust was $330,000.00

remainder of the trust assets were held in a residual trust. Both the trusts were to pay the income to Joan for her life. Upon the death of Joan or upon the death of Robert should Joan predecease Robert, the trust made provision for Douglas P. LaPlante, Daniel Webb, Barnaby Webb and Ellen V. Webb Sutherland. They were to be treated equally.

The Robert Webb Trust was created for the specific purpose of receiving the bulk of the assets of the trusts of F. M. Webb and Pearl Webb which are the subjects of this litigation. The trust provided that the settlor had the "right to revoke, change, alter, amend and in all other manner to revise the terms and conditions of [the] trust."

This trust was amended by instrument dated March 3, 1967. By the amendment the name of Daniel R. Webb was deleted with the intention that he take nothing by virtue of the trust. The same instrument named Richard Marx as co-trustee.

The separate trusts of F. M. Webb and Pearl Webb, which they seek to have reformed, are for all practical purposes identical. The trusts are irrevocable. Each trust was originally funded with 12,800 shares of the common stock of Combined Insurance Company of America which are to be held by the trustee "for the life of the donor." All of the income received by the trustee was to be paid to Robert. Upon the death of the donor, 10,000 of the shares of the stock originally deposited along with accumulated stock dividends upon all of the stock held by the trustee were to be delivered to Robert free from trust. The balance of the shares were to be delivered to certain named beneficiaries. The trusts each provided that if Robert predeceased the settlor [2] "all of the income shall be paid into a trust created on this 3rd day of October, 1966, by ROBERT M. WEBB, and shall be held by the TRUSTEE therein created in accordance with the terms and di-

rections contained in said trust as from time to time amended, signed by the said ROBERT M. WEBB as SETTLOR, on the 3rd day of October, 1966, for the purpose of that trust becoming a contingent beneficiary of the proceeds of this trust should ROBERT M. WEBB predecease the SETTLOR herein.

"The trust herein referred to shall also become the beneficiary of and recipient of the original Ten Thousand (10,000) shares, plus all of the accumulated 'stock' dividends which the TRUSTEE herein is directed to retain for the benefit of ROBERT M. WEBB, should ROBERT M. WEBB predecease the SETTLOR.

"The trust herein referred to, created by ROBERT M. WEBB on this 3rd day of October, 1966, wherein the ST. LOUIS COUNTY NATIONAL BANK is TRUSTEE shall take the said Ten Thousand (10,000) original shares, plus all accumulated 'stock' dividends and shall handle and dispose of them as directed by ROBERT M. WEBB in the trust created by him and as amended from time to time, if so, at the death of ROBERT M. WEBB, herein referred to."

These trusts also provided that in the event Robert Webb should predecease settlor having revoked his trust of October 3, 1966, or if that trust for any reason should fail then the shares of settlor's trust which would have gone to the Robert Webb Trust should go to Daniel and Barnaby or the survivor of them or if neither of them were to survive then to the Salvation Army.

A few days before the trusts were executed, F. M. Webb met with Mr. O'Connor, his attorney, and went over the trusts. They spent adequate time to determine that Mr. Webb's objectives were carried out as closely as they could be formulated. The documents were executed at St. Louis County National Bank on October 3, 1966.[3] Present at the time were F. M. Webb, Pearl

---

**2.** The terms "donor," "grantor," and "settlor" are used interchangeably throughout the trusts and the testimony. We shall use the term "settlor."

**3.** There is some discrepancy as to the exact date upon which the trusts were signed, either October 3, 4, or 5. The exact date is not material to the consideration of the case. We shall use October 3, 1966.

Webb, their attorney, Virgil O'Connor, Robert Webb, his personal attorney, Richard Marx, Richard Fister, Trust Officer of the Bank, and one other representative of the Bank.

The conference at which the five trusts were executed lasted about forty minutes. Although Mr. Marx, Robert's attorney, had had a brief telephone conversation with F. M. Webb's attorney, he was not familiar with the plan. He had been assured by F. M. Webb's attorney that Robert's trust could be amended. While at the conference Robert asked Mr. Marx if he were certain that the trust could be amended. Mr. Marx assured him that it could be amended.

In early March of 1967, Robert Webb in preparing to take a business trip to Mexico, made arrangements for the sale of stock in order to pay certain notes and to have cash available. At that time he also executed a will and by instrument dated March 31, 1967, amended his trust as set out above.

On May 17, 1969, at approximately 8:00 in the morning, Robert Webb was found in his car in the closed garage of his home. The motor of the car was running. He died of carbon monoxide poisoning. He was also found to have a high percentage of alcohol in his system at that time.

To avoid undue factual repetition we shall develop the facts more fully as they pertain to the issues discussed.

## TRUST OF ROBERT WEBB

### VALIDITY

We first consider the contention that the trust and the amendment to the trust of Robert Webb was invalid because he lacked the mental capacity to execute those instruments.

With respect to this contention there was considerable evidence that Robert Webb was a heavy drinker. There was also evidence that Robert Webb had expressed the belief to his parents and to others that Daniel was not his child.

Defendant, Daniel Webb, produced Dr. Donald W. Goodwin, a specialist in alcohol and drug abuse. Dr. Goodwin had not attended or examined Robert. In response to a hypothetical question which detailed heavy drinking on the part of Robert and the formation of the idea of illegitimacy of Daniel, the doctor testified he could not make a diagnosis of alcoholism, but the circumstances detailed would be consistent with a form of delusion called conjugal paranoia.

Given the further hypothesis that on the day Robert Webb executed the trust instrument, October 3, 1966, he "discussed with his attorney the possibility or the right to cut off, or cut out, his son whom he believed to be illegitimate." The doctor testified he could not give an opinion as to whether Robert Webb's actions were the result of a delusion. The doctor further testified that deleting the name of Daniel from the trust by the amendment of March 3, 1967, would be "compatible" with "conjugal paranoia."

Dr. Robert S. Weinhaus, Robert's internist, also testified on behalf of defendant, Daniel. Robert Webb first became a patient of Dr. Weinhaus in November of 1966 when he received a smallpox vaccination. The doctor did not examine him and did not administer the vaccine. He, at that time, may have spoken to Robert very briefly. An office associate of Dr. Weinhaus examined Robert on April 11, 1967. The chief complaint was a convulsive seizure. Robert suffered some brief periods of blackouts. Tests revealed atrophy of certain portions of the brain. Dr. Weinhaus also testified that there was no time while Robert was in his presence when he was not able to use reasonable judgment.

When seen in April of 1967 Robert had "a chronic brain syndrome which meant some slight loss over a long period of time of a permanent sort" and "acute brain syndrome which had to do with the effects of recent ingestion of alcohol." At that time because of the acute syndrome his mental capacity was reduced from what he had been capable of, he was a little slower and less alert. The latter condition cleared rapidly. Dr. Weinhaus testified that he did not have a firm opinion of Robert Webb's mental ca-

pacity as of March 3, 1967. During Dr. Weinhaus' testimony reference was made to the date of October 3, 1966, the date upon which the trust was executed.

The court was presented with evidence from four of the persons who were present at the execution of the trusts in October of 1966. F. M. Webb's testimony was by deposition by way of written interrogatories taken on his behalf by his attorney. Pearl M. Webb testified at the trial. Neither of these persons testified with respect to Robert Webb's mental capacity to execute his trust.

Virgil O'Connor was called on behalf of the Estate of F. M. Webb. He testified that he met and talked with Robert at the time the trust was executed. As to competency, he noticed nothing unusual about him. Mr. Marx who was called as a witness on behalf of the Trustee, testified that he observed Robert's demeanor and manner prior to and at the time of the execution of his trust and he was "calm, normal, alert." He also testified that in the conference where all the trusts were executed Robert was assured that his trust could be amended.

The amendment to the trust was executed in Robert Webb's office on March 3, 1967. It was delivered to Mr. Webb for his signature by an associate of his attorney's office. There was no testimony with respect to Robert Webb's condition on that date. Mr. Webb and Mr. Marx made a business trip to Mexico commencing on March 5, 1967. Mr. Marx was with Robert for three days. During that time Robert was "perfectly calm, alert and paid attention to [the business that was being transacted.]" Robert stayed in Mexico after Mr. Marx returned to St. Louis.

■ As in the case of deeds and wills where it is sought to have a trust declared invalid because the settlor lacked the mental capacity to execute a valid trust, the burden is upon those seeking to have it so declared to prove that the settlor lacked such mental capacity at the time settlor executed the trust instrument. *McCoy v. McCoy*, 360 Mo. 199, 227 S.W.2d 698, 703[3–4] (1950). *Creek v. Union National Bank in Kansas City*, 266 S.W.2d 737, 747[3–4] (Mo. 1954).

■ Reviewing the evidence as detailed above we cannot say the court's finding that defendant, Daniel Webb, failed to carry his burden of proving that Robert was incapable of executing the trust instrument and the amendment on the dates they were executed, was against the weight of the evidence. While Dr. Goodwin testified the actions of Robert, as hypothesized, were compatible with the delusion of a conjugal paranoia he did not make a diagnosis of conjugal paranoia; and thus, as he testified, he could not say that the deletion of Daniel's name from the trust was the result of such a delusion. As detailed above, in April of 1967, Robert Webb was suffering from a form of brain damage. However, Dr. Weinhaus found that Robert used reasonable judgment about things when he was in the doctor's presence. Dr. Weinhaus was unable to give an opinion with respect to Mr. Webb's mental capacity as of March 3, 1967. Those persons present on October 3, 1966, at the execution of the trusts, who testified, stated that he was normal. No one testified that he was not normal at the execution of the amendment. On this issue we affirm the finding of the trial court.

Before we discuss other issues, we take note of the fact the trial court declared that portion of the amendment deleting the name of Daniel from the trust to be invalid. The court held Robert was acting under a material mistake of fact. The persons who could be said to have been aggrieved by the ruling restoring Daniel's name to Robert's trust as a beneficiary, have not appealed. Therefore, that issue is not before us.

## TESTAMENTARY NATURE OF TRUST

We next consider the contention that the instrument designated as the Robert Webb Trust is void as a testamentary disposition because it was not executed in accordance with the Statute of Wills, § 474.320, RSMo. 1969, for the reason that "the trust did not come into being until Robert's death."

It has long been held that "to establish a valid express trust inter vivos there must be (1) a beneficiary, (2) a trustee, (3) a trust res so sufficiently described or capable of identification that title thereto can pass to the trustee, (4) actual delivery of the corpus, its character considered or a legal assignment of the same to the trustee actually conveying present title to the trustee; or the retention of title by the owner under circumstances which unequivocally disclose an intent to hold it for the use of another." *Atlantic Nat. Bank v. St. Louis Union Trust Co.*, 357 Mo. 770, 211 S.W.2d 2, 5 (1948).

■ The principal thrust of defendants' arguments, though not clearly delineated in the "Points Relied On" appears to be that there was no present delivery "of an identifiable res." There was substantial evidence from which the court could find that the settlor paid over to the trustee the sum of one hundred dollars. The trust made provision for additions to the trust estate by Robert and other persons. It is conceded that it was the intent of the parties that the bulk of the trust estate should eventually come from the individual trusts of F. M. Webb and Pearl Webb. It clearly appears it was the intent of the settlor that this trust be used as the receptacle for the bulk of the corpus of the trusts of F. M. Webb and Pearl Webb. In order to accomplish this purpose it was necessary that a valid trust be created. As revealed by Robert's actions the trustee of his trust was also the sole legatee of his estate. Defendants have not cited us to any case nor have we found any case which would indicate that the "res" must be more substantial than that which was vested in the trustee at the time of the execution of the trust in this case.

■ The defendants also argue the trust must fail because no person would have a beneficial interest in the trust until after Robert's death. When Robert delivered $100.00 as the res to the trustee, the trust was created. Once the trust has been created the enjoyment of its benefits may be postponed. *Gardner v. Bernard*, 401 S.W.2d 415, 421[7] (Mo.1966). As pointed out in *Sims v. Brown*, 252 Mo. 58, 158 S.W. 624 (1913) it matters not whether the postponement of the enjoyment be measured by the life of the settlor, the life of a third person or by some other measure. It is also universally recognized that the settlor may reserve the right to revoke the trust without affecting its validity. The title and interest vests subject to divestiture only by revocation and if no revocation is made the title and interest become absolute. *Sims v. Brown*, l. c. 628. Neither the size of the res at the time the trust was created, nor the postponement of the enjoyment of the trust by the cestui qui trust in this case, serve to invalidate the trust. There was substantial evidence to warrant a finding that the trust of Robert Webb is not testamentary in character.

## TRUST AS CREATING AGENCY RELATIONSHIP

Defendants next urge that an agency relationship was created between Robert Webb and St. Louis County National Bank rather than a trust.

■ We agree with defendants that the nature of the instrument in question is dependent upon the intention of the settlor. In determining the intention of Robert we look to the instrument which was executed, and "the words and acts of the parties before, at the time of, and subsequent to the transaction . . ." *Masterson v. Plummer*, 343 S.W.2d 352, 355[2–6] (Mo. App.1961).

To sustain their position defendants direct our attention to the transactions on March 10, 1967, which involved the Robert Webb Trust. The Trustee's cash ledger with respect to this trust shows the following entries:

| | Description | Rec. | Disb. | Bal. |
|---|---|---|---|---|
| Oct 11 66 | Deposited by Grantor | | | 100.00 |
| Mar 10 67 | Scherck Stein and Franc, Inc. Proceeds sale 2,491 shares Combined Insurance $141,130.75 forwarded St. Louis County National Bank to pay off loan $52,000.00 | 89,130.75 | | 89,230.75 |
| Mar 10 67 | Deposit to checking account of Robert Webb Account #195 302 0 | | 23,048.54 | 66,182.21 |
| Mar 10 67 | St. Louis County National Bank in payment of interest on Loan to 3/10/76 | | 582.21 | 65,600.00 |
| Mar 10 67 | St. Louis County National Bank to wire funds to Bank of Mexico for the Account of Robert Webb | | 65,000.00 | 600.00 |

Defendants argue that this transaction, in which Robert's monies were placed into the trust and distributed from the trust to the settlor, show it was not Robert's intention to create a trust but rather to establish an agency relationship.

In order to fully understand the transaction it is necessary to view it in its proper setting.

On March 2, 1967, Robert wrote to the President of St. Louis County National Bank confirming a telephone conversation and advising the Bank that he had arranged with his broker to sell 2,491 shares of stock of Combined Insurance Co. and to turn the money over to the Bank. He directed the Bank to retain $52,000.00 of the proceeds to pay off his notes to the Bank and to deposit the remainder in his checking account.[4]

The Bank in turn sent the stock certificate and stock power to the broker with instructions to have the check for the proceeds made payable to the Bank for Mr. Webb.[5]

Robert made a business trip to Mexico on March 5, and was in Mexico at the time the above transactions were consummated. On the date the proceeds of the sale were delivered to the bank Mr. Kempland, a bank officer, received a call from Robert's attorney asking that $65,000.00 of the proceeds be wired to Mr. Webb in Mexico. Joan Webb also called and asked the bank to set aside $500.00 which she might require for a trip to Mexico.

The total proceeds of the sale were $141,130.75. The Bank retained $52,000.00 of the proceeds to pay off the principal amounts of Robert's notes. Mr. Kempland in his testimony explained that the balance of $89,130.75 was paid over to the bank as trustee under the Robert Webb Trust. From that sum, as revealed by the ledger, the Bank as trustee paid the interest which was due the Bank on the notes in the sum of $582.21; $65,000.00 was disbursed to the Bank to be sent by wire to the Bank of Mexico for Robert; $500.00 was retained in trust in the event that Joan should require the funds; and the remaining balance of $23,084.54 was deposited in Robert's checking account.

■ Mr. Kempland, when called as a witness for intervenors and Barnaby, testified,

4. "Regarding our telephone conversation of March 2, 1967, I have contacted Scherck, Stein & Franc, Inc., Mr. Richard Fisher, to sell my 2491 shares Combined Insurance Co. stock and they in turn will forward this money to you.

From these proceeds I want to pay off the $32,000.00 note and the $20,000.00 note that I have with your bank, and deposit the balance in my checking account # 195–302–0."

5. "Mr. Robert M. Webb has instructed us to forward to you the enclosed Certificate No. X47116 for 2,491 shares Combined Insurance Company of America common which you have sold for his account. A stock power signed by Mr. Webb is attached to the certificate.

Please deliver your check for the proceeds of this sale to our messenger, and we request that this check be made payable to this bank for the account of Robert M. Webb."

that he was the person who made the decision to place the $89,130.75 balance of the proceeds of the stock sale into the Robert Webb Trust. He, at first, testified this was authorized by Robert's letter and subsequent requests of his attorney and his wife. He also stated that the check for the proceeds was made out to Robert and they had no authority to draw checks on Robert Webb's checking account.[6] The trial court found that this transaction was authorized by the terms of the trust which reserved unto Robert "the right to add additional monies to the trust and under the implied powers which trustees have to affect the intention of the [settlor]." While we may not agree with this finding of the trial court because we find no intention on the part of the settlor to deposit the funds into the trust at the time they were deposited, we reach the same result. A correct decision will not be disturbed because a trial court may give a wrong or insufficient reason therefor. *Edgar v. Fitzpatrick*, 377 S.W.2d 314 (Mo. banc 1964).

Contrary to Mr. Kempland's original conclusion concerning the authorization to use the trust to accomplish Mr. Webb's purpose, Mr. Webb gave no such authorization. His letter to the President of the Bank makes no direct or indirect reference to the trust. To the contrary, his letter requests that the Bank retain funds to pay the notes and put the remainder into his checking account. The Bank understood that this was Robert's intent, because they advised the broker that the check for the proceeds of the sale of stock was to be made payable to the Bank for Robert's account.

There is no evidence from which it can be said that at the time Robert executed the trust instrument he intended to create the relationship of principal and agent between himself and the trustee, or that he contemplated the trust would be used as the Bank undertook to use it in the transaction under consideration. Robert's requests with respect to the sale of the stock and the distribution of the proceeds made no direct or indirect reference to the trust. The Bank held his notes and was holding his stock as collateral, he also had a checking account with the Bank. He was dealing with the Bank as a customer of the banking department, not as trustee of the Robert Webb Trust.

Defendants refer us to a letter written by a trust officer of the Bank to Robert explaining the manner in which the transaction was handled.[7] They argue because there is no evidence that Robert objected to this use of the trust, Robert's "successors, representatives, and St. Louis National Bank, as trustee are estopped from arguing that these personal transactions were carried out through ignorance, mistake or fraud without the knowledge of Robert."

Defendants concede that Robert did not direct the use of the trust and they do not contend he had knowledge of such use until after the fact. By the time Robert was informed of the transaction it was a "fait accompli." An objection would not serve to reverse the transaction. It is noted that there were no subsequent transactions of this nature.

6. The record before us is not clear but it appears from the contents of a letter that there may have been two checks, one for $52,000.00 and one for $89,130.75.

7. "The final check for the proceeds of sale of the 2,491 shares of Combined Insurance, in the amount of $89,130.75, has been received by us.

A check for $52,000 was sent to our discount department in payment of your obligation to them.

Dick Marx contacted Dick Kempland, in my department in my absence, and gave him your instructions to wire $65,000 to you by Friday. For this reason we deposited the $89,130.75 to your trust account, issued our check to the banking department for $65,000 for purposes of the wire, paid the discount department $582.21 which was the interest on your loan, and deposited $23,548.54 to your checking account.

When you add these figures, you will discover they are $500 short. This is the result of a conversation Mr. Kempland had with Mrs. Webb, wherein she indicated she needed $500 for transportation to Acapulco. We have, therefore, held this amount back and expect to hear from her. We will be in touch with her this afternoon and will make arrangements for getting the money to her. I felt confident that you would want us to handle it in that manner."

We have heretofore made the determination that the trial court did not err in finding that Robert Webb created a trust when he executed the instrument of October 3, 1966, and delivered the res to the trustee. The subsequent actions of the trustee in the transaction of March 10, 1967, did not evidence an intention on the part of the settlor that the instrument which he executed should not constitute a trust. The right to revoke, alter or amend the trust was retained in the settlor alone. The actions of the trustee in accepting and then disbursing some of the proceeds of the sale of stock without the specific directions of the settlor did not cancel, alter, amend or revoke the trust. The power of revocation is personal to the holder of that power and it can be exercised only by the person to whom the power is granted by the terms of the trust. *In Re Estate of Henning,* 116 N.J.Super. 491, 282 A.2d 786, 788 (1971).

At the time Robert Webb was making arrangements for the sale of the stock he also executed his will. By the terms of the will the trustee under the instrument dated October 3, 1966, was made the sole legatee. The will provided that the assets be administered in accordance with the terms of the trust instrument. This will was never revoked. We view these facts as further evidence that Robert intended to create a trust at the time he executed the trust instrument, and that he considered it to be in existence on and after March 10, 1967.

We agree with the trial court that Robert intended to and did create a revocable inter vivos trust which came into existence at the time it was executed and which was still in existence at the time of his death; that he did not intend to create an agency relationship at the time of the execution of the trust and that the transaction of March 10, 1967, does not evidence any change of intention on the part of Robert.

## MARITAL DEDUCTION

While the "Point Relied Upon" is not explicit we read it along with the argument as a contention by defendant, Barnaby Webb, that the interest of the Robert Webb Trust in the F. M. Webb and Pearl Webb Trusts do not qualify for the marital deduction under 26 U.S.C. § 2056 because the power of appointment is not exercisable immediately upon Robert Webb's death for the reason that the "interest received by [Joan] through Robert's trust is terminable and therefore is not subject to use for marital deduction purposes."

Pertinent parts of Section 2056 of the Internal Revenue Code of 1954, the statutory authority for the marital deduction read as follows:

"2056. *Bequests, etc., to surviving spouse*

(a) *Allowance of marital deduction.*—For purposes of the tax imposed by section 2001, the value of the taxable estate shall, except as limited by subsections (b), (c), and (d), be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate.

(b) *Limitation in the case of life estate or other terminable interest.*—

(1) *General Rule.*—Where, on the lapse of time, on the occurrence of an event or contingency, or on the failure of an event or contingency to occur, an interest passing to the surviving spouse will terminate or fail, no deduction shall be allowed under this section with respect to such interest—

(A) if an interest in such property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to any person other than such surviving spouse (or the estate of such spouse); and

(B) if by reason of such passing such person (or his heirs or assigns) may possess or enjoy any part of such property after such termination or failure of the interest so passing to the surviving spouse;

and no deduction shall be allowed with respect to such interest (even if such deduction is not disallowed under subparagraphs (A) and (B))—

(C) if such interest is to be acquired for the surviving spouse, pursuant to directions of the decedent, by his executor or by the trustee of a trust.

. . . . .

(5) *Life estate with power of appointment in surviving spouse.*—In the case of an interest in property passing from the decedent, if his surviving spouse is entitled for life to all the income from the entire interest, or all the income from a specific portion thereof, payable annually or at more frequent intervals, with power in the surviving spouse to appoint the entire interest, or such specific portion (exercisable in favor of such surviving spouse, or of the estate of such surviving spouse, or in favor of either, whether or not in each case the power is exercisable in favor of others), and with no power in any other person to appoint any part of the interest, or such specific portion, to any person other than the surviving spouse—

(A) the interest or such portion thereof so passing shall, for purposes of subsection (a), be considered as passing to the surviving spouse, and

(B) no part of the interest so passing shall, for purposes of paragraph (1)(A), be considered as passing to any person other than the surviving spouse.

This paragraph shall apply only if such power in the surviving spouse to appoint the entire interest, or such specific portion thereof, whether exercisable by will or during life, is exercisable by such spouse alone and in all events.

. . . . .

(e) *Definition.*—For purposes of this section, an interest in property shall be considered as passing from the decedent to any person if and only if—

(1) such interest is bequeathed or devised to such person by the decedent;

(2) such interest is inherited by such person from the decedent;

(3) such interest is the dower or curtesy interest (or statutory interest in lieu thereof) of such person as surviving spouse of the decedent;

(4) such interest has been transferred to such person by the decedent at any time;

(5) such interest was, at the time of the decedent's death, held by such person and the decedent (or by them and any other person) in joint ownership with right of survivorship;

(6) the decedent had a power (either alone or in conjunction with any person) to appoint such interest and if he appoints or has appointed such interest to such person, or if such person takes such interest in default on the release or non-exercise of such power; or

(7) such interest consists of proceeds of insurance on the life of the decedent receivable by such person.

Except as provided in paragraph (5) or (6) of subsection (b), where at the time of the decedent's death it is not possible to ascertain the particular person or persons to whom an interest in property may pass from the decedent, such interest shall, for purposes of subparagraphs (A) and (B) of subsection (b)(1), be considered as passing from the decedent to a person other than the surviving spouse. Aug. 16, 1954, c. 736, 68A Stat. 392; Oct. 4, 1966, Pub.L. 89–621, § 1(a), 80 Stat. 872."

In determining whether an interest which qualifies for the marital deduction passed from the decedent, Robert to his wife, Joan, we must determine the intent of the parties as gleaned from the trusts as the controlling documents.

The trusts of F. M. Webb and Pearl Webb provide that Robert Webb was to receive all of the cash income generated by their respective trusts during his lifetime. In the event he survived a settlor, he was to receive 10,000 shares of Combined Insurance Co. stock and any accumulated stock dividends. The trusts further provided that if he predecease a settlor the Robert Webb Trust of October 3, 1966, as contingent beneficiary, was to receive the income and upon settlor's death Robert's trust would receive that portion of the corpus that Robert Webb would have received if he had

survived. Most significant to our consideration the parents trusts provided that (1) the income of their trusts should be held by the trustee of Robert's trust in accordance with the terms and directions of Robert's trust "as amended from time to time;" (2) that Robert's trustee take the designated portion of the corpus of their trusts and "shall handle and dispose of them as directed by Robert M. Webb [in his] trust" as amended from time to time "at the death of Robert M. Webb . . ."

At the outset the Robert Webb Trust was the contingent beneficiary of the F. M. Webb and Pearl Webb Trusts. Upon the death of Robert the interest of Robert's trust in those of his parents was no longer contingent. The Robert Webb Trust had an absolute and indefeasible interest in that portion of the corpus of the trusts of F. M. Webb and Pearl Webb which was designated by them. See *Bookwalter v. Lamar*, 323 F.2d 664 (8th Cir. 1963). Contrary to Barnaby's argument F. M. Webb and Pearl Webb did not "retain a life estate" in their respective trusts. By paragraph 10 of their respective trusts they announce their intention to completely divest themselves of "all right, title and interest in the property being placed . . . [in trust] and any and all earnings, income, stock or any other benefits which may accrue. . . ."

While the F. M. Webb and Pearl Webb Trusts retain physical possession of the stock the beneficial interest passed to the trust of Robert Webb, immediately upon his death. By the terms of the F. M. Webb and Pearl Webb Trusts the trustee in Robert's trust was obligated to "handle and dispose [of the corpus] as directed by Robert M. Webb in the trust created by him and as amended from time to time, if so, at the death of Robert M. Webb . . ." as contemplated by this provision Robert's trust directed the disposition of those interests flowing to his trust. Robert's trust created the marital trust and residuary trust, with Joan to receive the income from each during her lifetime and with the power to appoint by will all of the assets in the marital trust.

Neither F. M. Webb, Pearl Webb, their trustees, nor Robert's trustee nor any other person can prevent the income from the F. M. Webb and the Pearl Webb Trusts or the beneficial interest in that portion of the corpus allocated to Robert, from flowing into Robert's trust and being disposed of in the manner directed by Robert. Immediately upon the death of Robert, and at any time before her death, Joan has the power by execution of a will to appoint those interests. No future event with the exception of her death could terminate her right to the income, or her power to appoint the corpus by her will. Joan's interest is a life estate with a power of appointment as provided in 26 U.S.C. § 2056(b)(5).

We conclude that the interests which Joan acquired from the trusts of F. M. Webb and Pearl Webb by way of Robert's trust are not terminable interests so as to defeat Robert's intention to provide a marital deduction trust.

## TRUSTS OF F. M. WEBB AND PEARL WEBB

### REFORMATION

Daniel Webb complains that the court erred when it did not reform the trusts of F. M. Webb and Pearl Webb to express their intention to provide primarily for Daniel and Barnaby in the event that Robert should predecease them. He argues it was intervenor's intention that if Robert amended his trust so as to diminish or eliminate the interests of Daniel or Barnaby then the interest of Robert's Trust in the trusts of the intervenors would fail.

The principles governing reformation of instruments has best been stated in *Grossman Wrecking Co. v. Bituminous Casualty Corp.*, 518 S.W.2d 719, 725 (Mo.App.1974), which we quote in part:

". . . in order for reformation to be decreed the evidence showing mutual mistake must be clear, cogent and convincing, and the burden of proof is upon the appellant to show that the [instrument] was as contended by the [person seeking reformation]. (citations omitted)

The mistake must be made out by the 'clearest evidence' and 'upon testimony entirely exact and satisfactory.' (citations omitted) If there are circumstances which in common prudence ought to put a party to particular inquiry by which inquiry the party could have discovered the true facts, reformation may then be an inappropriate remedy."

We have scrutinized the argument of this defendant with respect to this issue. We find no reference to the transcript in his argument to any evidence which is clear, exact, and satisfactory so as to warrant reformation. He argues broadly that the intentions of F. M. Webb and his scrivener are clear and unequivocal, but directs us to no evidence of record in support of these assertions.

In our search of the transcript we have found testimony from F. M. Webb by way of written interrogatories. He testified it was his intention to make sure that Daniel and Barnaby were treated equally and got the bulk of the stock from Bob's trust. The attorney for F. M. Webb could not remember the exact words of the instructions given to him by Mr. Webb but he did recall that the settlor wanted "Daniel and Barnaby to receive a substantial share of the corpus of Bob Webb's trust." He further testified that, "The general substance of those instructions, throughout the entire package, was that these boys should share substantially in the proceeds of these trusts."

 The trusts of intervenors and the trust of Robert were drawn by F. M. Webb's attorney after consultation with F. M. Webb and after rough drafts were reviewed by the trust officer of the Bank. F. M. Webb testified that his attorney had sent him a draft of the trusts before the date they were executed. The attorney went over a draft of the trusts with F. M. Webb to be sure that he had gotten his instructions straight. This was a few days before the three trusts were executed and F. M. Webb spent adequate time with the attorney in the attorney's office to see that his objectives had been carried out.

By the terms of Robert's trust, as originally drawn and as decreed by the trial court to include Daniel, the primary beneficiary is his wife Joan. She is to have the income of the entire trust estate for her lifetime with the right to appoint the whole of that portion designated as the "marital deduction trust." Daniel and Barnaby along with Robert's adopted daughter, Ellen and Joan's son, Douglas, are the secondary beneficiaries. This trust was part of the "package" constituting the estate plan of F. M. Webb and of his wife, Pearl. It was drawn at the request of F. M. Webb. It was reviewed by F. M. Webb and his counsel. Clearly, Daniel and Barnaby were not the primary beneficiaries, nor were they to eventually receive the bulk of the trust estate. When we consider these facts along with the fact that Robert's trust reserved in him the unbridled right to amend, the trial court did not have the seeds of a contrary intention before it. At most the above facts considered in the light of F. M. Webb's knowledge that Robert did not believe that Daniel was his son, were circumstances which in common prudence ought to have put F. M. and Pearl Webb upon inquiry by which the effect of the language of the trust could have been fully understood.

The trusts of F. M. Webb and of Pearl Webb clearly and unequivocally provide that in the event Robert should predecease them the income, and upon their death, a designated portion of the corpus should be paid over to the trustee of Robert's trust to be handled and disposed of "as directed" by Robert in the trust created by him "as amended from time to time." These provisions would have failed only in the event that Robert had predeceased a settlor having revoked the trust or in the event the trust would have otherwise failed.

F. M. Webb and his attorney were responsible for drawing each of these trusts. The attorney testified that the power to revoke and the power to amend were "deliberately" included in Robert's trust. The trusts of intervenors recognizes the fact that Robert's trust was subject to amend-

ment without limitation. The terms of the trusts are clear and unequivocal. There is no contention that F. M. Webb did not read the trusts or that he was incapable of reading them.

While much is said by F. M. Webb and his attorney about the desire to make "the boys," Daniel and Barnaby, the favored beneficiaries, the trust which was drawn at the request of intervenors by their counsel for Robert, provides primarily for Joan and secondarily for "the boys" and Robert's adopted daughter, as a natural object of his bounty and his wife's son, a proper consideration. The trial court could find that intervenors knew of and understood these provisions. That they were cognizant of Robert's right to amend is further evidenced by the fact that they made additional provisions for Daniel and Barnaby in separate trusts. The latter trusts were executed at the time the trusts in litigation were executed. These trusts provided solely for Daniel and Barnaby and their heirs with charitable beneficiaries as a remote contingency. At the time of trial, the corpus of these trusts were valued at $330,-000.00 each.

We cannot say that this defendant has demonstrated a manifest abuse of discretion on the part of the trial court in refusing to reform the trusts of intervenors. *McNeal v. Manchester Insurance and Indemnity Co.*, 540 S.W.2d 113, 119 (Mo.App. 1976).

The attorney who drew the trusts testified that his notes did not include any terms or conditions which he omitted from the trusts. The court was warranted in finding that counsel for intervenors drew the trusts as counsel understood intervenors wanted them drawn and that the trusts were prepared substantially in accord with intervenors' desires.

## REMOVAL OF TRUSTEE

Defendant, Barnaby Webb, and intervenors contend that the court erred in not removing St. Louis County National Bank as trustee of the F. M. Webb and of the Pearl Webb Trusts, because it has breached its fiduciary duties. As we read the brief of these contestants they contend (1) that the trustee breached its duty to protect the contingent remaindermen of intervenors trusts and thus caused "hostility to develop between the contingent remaindermen Barnaby and Daniel and the Bank as Trustee;" (2) that the trustee breached its fiduciary duty when an assignment of funds due Joan Webb from Robert's trust was drawn as additional security for a note held by the Bank which had been signed by Robert and Joan Webb.

The general principles with respect to the removal of trustees are found in *Shelton v. McHaney*, 343 Mo. 119, 119 S.W.2d 951, 954 (banc 1938):

> "The removal of a trustee calls for the exercise of a sound judicial discretion, which should not be abused. (citations omitted) A trustee will not 'be removed for every violation of duty, or even breach of trust, if the fund is in no danger of being lost. * * * There must be a clear necessity for interference to save the trust property. Mere error, or even breach of trust, may not be sufficient; there must be such misconduct as to show a want of capacity or of fidelity, putting the trust in jeopardy.' 1 Perry on Trusts, 7th Ed. § 276, notes 93, 94."

The Bank, a trustee in each of these trusts and two trusts for the benefit of Daniel and Barnaby, was appointed by the settlors who were fully aware of the position of the Bank and with the purpose that the trustee perform its trust with full knowledge of the entire estate plan of settlor so that it could implement and effect the overall plan. We find no conflict.

It is apparently the position of these parties that the trustee had a duty to the contingent beneficiaries of the intervenors' trusts to attack the trust of Robert Webb and failing that to advocate the reform of intervenors' trusts so as to defeat the purposes of all of the trusts as originally prepared.

To the contrary it is generally held that once having accepted the trust a

duty devolves upon the trustee to do whatever is necessary to protect and preserve the trust property or to defend the integrity of the trust. *Murphey v. Dalton*, 314 S.W.2d 726, 732 [9–10, 13] (Mo.App.1958). It is the trustee's duty to the beneficiaries not to destroy the trusts and to prevent its destruction by others including the settlors. Scott on Trusts, 3rd Ed., Vol. II, § 178, p. 1429.

■ These defendants would have the trustee ignore its duty to all of the other beneficiaries named in the trusts and its duty to defend the trusts. The trial court properly refused to hold that the trustee's duty was to Daniel and Barnaby alone. Any hostility that may have developed between Daniel and Barnaby and the trustee because the trustee performed its duties toward the trusts is no ground for its removal. It is generally held that, "Mere hostility between trustees and cestuis is insufficient in law to require the removal of trustees." *Shelton v. McHaney*, 1. c. 119 S.W.2d 961.

■ These defendants also complain that the drafting of an assignment of funds due Joan to forestall sale of securities held as collateral security constituted such a breach as to warrant removal of the trustee.

Joan and Robert had executed a note in the sum of $15,000.00 to the Bank which had matured after Robert's death and was unpaid. Joan and Robert had placed certain stocks with the Bank as collateral security. These stocks were depressed at this time. Joan had no funds available with which to pay the note. Monies due Robert's trust as income from the intervenors trust was being withheld because of the controversy between the parties to this litigation. In order to avoid the sale of the collateral Joan offered to assign the income which had accrued to Robert's trust for her benefit. The Bank had an assignment drawn, however after consultation with counsel it was never executed.

It is contended that this proposed transaction constitutes self-dealing to its own advantage and defendants cite us to Bogert on Trusts, 2nd Ed. § 527, p. 374, which we quote:

" . . . the retention of trust property to secure an obligation owed by the cestui to the trustee has been held not to warrant removal, even though the trustee had acted beyond his powers in withholding the property. Likewise, it is no ground of removal that the trustee acted for his own advantage in a matter that could not endanger the trust estate."

We believe that this exposition of the law adequately answers defendants' contentions on this issue contrary to their contention. In the case at hand the trustee abandoned its purpose after consulting further with respect to their right to take an assignment. We believe along with the trial court that this incident falls far short of constituting a breach of fiduciary duty on the part of the trustee.

Sound judicial discretion did not require removal of the trustee in this case. The trial court cannot be convicted of error in refusing to remove the trustee.

The next point presented to us reads: "The Trial Court apparently excluded relevant material evidence on the basis of the Dead Man's Statute in failing to reform the Francis M. Webb and Pearl M. Webb Trusts."

■ This point presents nothing for us to consider under Rules 84.04(d) and 84.04(h). In neither the point nor in the argument are we advised of any evidence which it is claimed the court failed to consider. We are not directed by this defendant to any ruling by the court which would indicate that the court excluded relevant and material evidence because of the Dead Man's Statute. *Simpson v. Island View Sales Corp.*, 540 S.W.2d 624, 625 [1–3] (Mo. App.1976). In any event the admission or rejection of evidence is not an issue in a court tried case, "The issue is whether the evidence should have been admitted and considered, or rejected and not considered, and when that issue is determined the next issue is what the judgment of the court should be, based on a consideration of the

competent and admissible evidence." *Thau-Nolde, Inc. v. Krause Dental Sup. & Gold Co., Inc.,* 518 S.W.2d 5, 9 (Mo.1974). As evidenced by the portion of the opinion with respect to reformation of the trusts we have gratuitously considered all of the relevant evidence produced on that issue in accordance with *Thau-Nolde, Inc. v. Krause Dental Sup. & Gold Co., supra,* and Rule 73.01, subd. 3(c).

The final point reads:

"Neither plaintiff nor St. Louis County National Bank can assert the physician-patient relationship: but if there were any such privilege available to them, it was waived. Hence, the trial court's refusal to accept the evidence of insane delusion of Robert M. Webb was erroneous."

If the point raises a question of the consideration of admissible evidence the point and the argument thereunder contain the same flaw as does the previous point. If we can read this point as contending that the evidence produced by Dr. Weinhaus required a finding by the court that Robert Webb had an insane delusion regarding the legitimacy of his son, Daniel, which affected the execution of his trust and the amendment, the issue has heretofore been ruled.

The judgment of the trial court is affirmed in all respects. The cause is remanded to the trial court for further proceedings as reserved to the court in its judgment.

CLEMENS, P. J., and DOWD, J., concur.