Betty C. BREEN, Petitioner, Appellant,

v.

Roland B. MILLER, Jr., Executor,
Respondent.

No. WD 32403.

Missouri Court of Appeals,
Western District.

Jan. 12, 1982.

James L. Burgess and Berry F. Laws, III,
Kansas City, for appellant.

John R. Moore and John R. Cady, Platte
City, for respondent.

Before KENNEDY, P. J., and SHAN-
GLER and WASSERSTROM, JJ.

KENNEDY, Presiding Judge.

This is an appeal by one of the beneficiaries of the estate of Bess Newby Murray, deceased, from an order of the Probate Court of Platte County, refusing after an evidentiary hearing to revoke the letters testamentary of Roland B. Miller, Jr., and refusing to grant other relief requested by petitioner.

The judgment of the probate court is reversed and the cause is remanded to the probate court for further proceedings.

The evidence discloses that Mr. Miller was appointed coexecutor of the decedent's will on June 21, 1954, and that he has continued to serve in that capacity since that time—at trial time more than 26 years. An inventory and appraisement was filed in the estate February 28, 1955. A notice was published in a local newspaper that final settlement would be filed on July 11, 1955, but no final settlement was actually filed then or later.

Mr. Miller's co-executor died in 1970 and Mr. Miller has served as sole executor since that time.

The present proceeding was filed April 22, 1980, by Betty G. Breen. She is the daughter of Mary Newby Browning, a beneficiary under the decedent's will, who died in October, 1970. The relief requested was an "audit and accounting" of the executor's accounts, the removal of the executor, and the surcharging of the executor with "all losses and expenses improperly incurred by him."

Mr. Miller and his co-executor promptly upon their appointments in 1954 secured a probate court order to take possession of two farms belonging to the decedent, along with other real estate with which we are not now concerned. The "Wills farm" consisted of approximately 186 acres and the "Larkins farm" consisted of approximately 200 or 205 acres, acreages now reduced by highway condemnations. They are located a short distance east of Platte City. This land was appraised at the testatrix' death at $300 to $400 per acre, but at the time of the present proceeding it had increased in value to $2,500 per acre or more.

Mr. Miller and his co-executor early in the administration entered into an arrangement with a Mr. Lloyd Babcock to operate a farming business on the two farms. It appears that Mr. Babcock had operated a farming business on one of the farms under an arrangement with the testatrix, and that the arrangement was continued and expanded to include the second farm by agreement between the executors and Mr. Babcock. This arrangement was referred to by Mr. Miller and by his attorneys as a landlord-tenant relationship, but it appears instead to be an equal partnership business venture between the estate and Mr. Babcock, which we will describe more fully later in the opinion. The farming operation has never been very profitable and actually lost money in 1976, 1977 and 1978. There was never any probate court order authorizing the continuation of any business of the decedent, as required by § 473.300, RSMo 1978. Mr. Miller in the hearing in this

proceeding said he supposed that the order to take possession of the real estate authorized the arrangement with Mr. Babcock.

Mr. Miller in the hearing in this proceeding explained his failure to close the estate on the ground that the testatrix' will contained a power to sell the real estate, which power he interpreted as being personal to himself, and the farms had not yet been sold. By keeping the power of sale operative, he explained, the land could be conveniently sold when the heirs wanted it sold.

■ Mrs. Breen advances three reasons why she believes that Mr. Miller has been derelict in his duties as executor and that the probate court was in error under § 473.140, RSMo 1978 (amended Ann.Supp. 1981), in refusing to revoke his letters testamentary. Said statute calls for the removal of an executor who is "in anywise incapable or unsuitable to execute the trust reposed in him or fails to discharge his official duties, or wastes or mismanages the estate."

1. *Delay in completing administration and distributing estate.*

As earlier noted, the estate has been in the process of administration since June 21, 1954.

Section 473.540.2(1), RSMo 1978 (now amended Ann.Supp.1981, but in effect from January 1, 1956, till January 1, 1981), required final settlement "[o]n the first court day after the expiration of one year following the date of the first letters granted on the estate unless the matter is continued by the court". Subsection 3 of said section allowed the court "for good cause shown" to extend the time for filing any settlement or to allow late filing of the same. Its predecessor and successor statutes contained similar provisions.

■ This statute, while providing for flexibility to allow for an extended administration if the nature of the case required it, contemplated early completion of administration and the early distribution of the assets of the estate to those entitled thereto. *In re Alexander's Estate*, 360 S.W.2d

92, 101 (Mo.1962); *In re Mills' Estate*, 349 Mo. 611, 162 S.W.2d 807 (1942). Respondent points to nothing in the nature of the estate, in its condition or in its assets which would have made it difficult fully to administer the same within a one or two-year period. An examination of the file discloses to us no obstacle to prompt an uneventful completion of the administration. No application was ever made, nor any order made by the court, authorizing an extended administration.

The executor suggests two justifications for the continued administration.

He points out that he has a power of sale of the real estate, and that the estate should not be closed before the real estate is sold. The will provides: "I hereby direct that my executors may sell for purposes of distribution or otherwise any of my residuary estate, real, personal, or mixed, whenever they think it desirable to do so and they are hereby fully authorized to execute the proper conveyance as fully as I myself could do if alive".

The existence of the unexercised power of sale does not excuse the failure to wind up the estate. It might justify some extension of time by the probate court, if active efforts to sell the real estate were unavailing, or if the immediate sale is inadvisable. But we have no such case here. No extension of time for settling the estate has ever been sought from the probate court. There is no showing that there has ever been any active effort to sell the property. At one time, in 1971, an application was granted to employ an agent to sell the real estate, but nothing ever came of that.

■ The executor argues next: "For 25 years, the beneficiaries of this estate, with full knowledge of the continuation of the farming operation and the administration of said estate, have encouraged, acquiesced therein and consented to the executor's farming operation and administration of the estate and they have received benefits therefrom." This argument apparently is based upon the fact that the executor or his attorneys would from time to time write to the beneficiaries, reporting on the income and expenses of the farm operation, and other matters connected with the estate. The first of these letters appearing in the record was 1967. There are four later letters shown in the file. There was testimony of unspecified discussions with unidentified beneficiaries of the estate. The most we can gather from the evidence is that there was never any concerted demand by the heirs that the estate be closed. This by no means justifies the continued administration of this estate. The executor has it backwards. It is he who is to take the initiative in concluding the estate administration. He cannot await the heirs' demands that the estate be closed.[1]

2. *Unauthorized operation of business.*

As noted in our statement of facts, the estate has for many years had an arrangement with Mr. Lloyd Babcock for the operation of the two farms belonging to the decedent. This is an informal oral arrangement which has never been committed to writing. While it is referred to as a landlord-tenancy relationship, it is plainly a partnership between the estate and Mr. Babcock, with the estate sharing equally in the profits and the losses. The manner of operation is somewhat relaxed. When Mr. Babcock sells livestock, grain, or milk, he pays the estate its share by depositing it in the estate bank account. On the periodic settlements such sales are reported simply as, for example, "sale of milk" or "sale of cows and hogs". As to farm expenses incurred in the operation of the business, they are shown on settlements as payments to "Lloyd Babcock (farm expense)". Mr. Miller in his testimony said that Mr. Babcock would periodically present him with a list of expenses and he would reimburse him the amount shown. Once the estate borrowed $40,000 from the Wells Bank in Platte City for a six-month period in 1976. The probate court settlements do not show a half-

---

1. Several of the original beneficiaries of decedent's will have died and are represented by their respective heirs and devisees. They are widely scattered geographically.

interest in a farm inventory of feed and livestock which is shown in occasional reports to the beneficiaries. At the end of 1972 the estate's share of this inventory amounted to $16,557, according to a communication from the executor's attorney to Mrs. Breen's attorneys in Billings, Montana. A January 1967 inventory showed the estate's share of the farm inventory at $11,796.

The operation of this business has been without any probate court order as required by § 473.300, RSMo 1978. While that statute recognizes the need in some instances for the continued operation of a decedent's going business, the statute recognizes the risks of entrepreneurship and recognizes the general proposition that the fiduciary does not subject his trust estate to the hazards of business enterprise. One can risk his own money, but not funds held in trust for others. That is elementary. In recognition of this proposition, the statute hedges about with safeguards the procedure for securing the probate court order authorizing the continuation of the going business. It requires notice to all interested persons, provides for limiting the liability of the estate, and provides for specifying the time for which the business may be conducted "and such other conditions, restrictions, regulations and requirements as the court orders". Sec. 473.-300(4), RSMo 1978.

In this case the fiduciary has proceeded without any court order and without any restrictions such as a probate court order might impose. The farming operation has "never made a great deal of money" according to a report to the beneficiaries, and in at least three years—1976, 1977 and 1978—has actually lost money. In 1968 it "just about broke even". The sizes of the profits and of the losses are not ascertainable from the record we have before us.

■ In operating the business without a probate court order, the executor was guilty of a breach of duty. *Metzger v. Metzger,* 153 S.W.2d 118, 121[1] (Mo.App.1941); 31 Am.Jur.2d, *Executors and Administrators,* § 221 (1967).

3. *Failure to make distribution of estate assets.*

Beginning with an inventory filed May 6, 1957, two items have remained constant. One is "furniture, household goods, wearing apparel", $850. The other is, "all other personal property, inventoried at", $2,753.95.

Mr. Miller explained that the $850 item consisted of certain jewelry which he still had in his possession, and a certain fur coat which was in his basement but had deteriorated. His reason for failing to sell or distribute the jewelry was that the beneficiaries never instructed him what should be done with it. " . . . (I)t was always just sort of left up in the air as to who might take what . . . "

■ It is the duty of the executor to make distribution as early as possible and his failure to distribute these assets is a breach of duty. *In re Alexander's Estate,* supra at 101.

The $2,753.95 item could not be identified by the executor. He tentatively identified it as farm equipment remaining unsold. He said: "I don't know whether it's worn out or been sold or whether some of it's still out there."

4. *Failure to file timely settlements in proper form.*

Appellant complains of the executor's settlements filed in the probate court. Sec. 473.540, RSMo 1978 (amended in Ann.Supp. 1981), provides for annual settlements, with claimed credits supported by proper vouchers. Mr. Miller's settlements have been filed irregularly. Over the 27-year period of the administration, 11 settlements have been filed. The last one shown in the record, which was filed March 27, 1980, covered a period of 37 months. Nine settlements covered periods of 18 months or longer.

The settlements do not comply with the requirements of § 473.543, RSMo 1978 (amended Ann.Supp.1981), relating to contents of settlements. In many instances, particularly in the case of the sale of livestock and other farm products, there is no

showing from whom the amount was collected. Farm expenditures are lumped together indiscriminately, to "Lloyd Babcock (farm expenses)". Interest rates and periods of time involved on funds invested for the estate are not shown on the settlement. The credits are not supported by vouchers.

The executor received interest or income checks for the estate between 1977 and 1979 which totaled $2,056. He did not deposit them in the bank until June, 1980, when a court-appointed master began an audit of the estate account. Mr. Miller explained, "I just neglected to have those deposited. They piled up".

### 5. Other instances of neglect.

The fact is Mr. Miller has given the estate very little personal attention since 1973. He stated, "I've done very little. I've signed checks and I've met with the tenants and that's about it." The management of the estate affairs has been entrusted largely to the executor's attorney, Mr. Moore.

The foregoing pattern of disregard of legal requirements makes it perfectly plain that the letters testamentary of the executor ought to be revoked. We therefore reverse the judgment of the probate judge and remand the case to the probate court with directions that an order be entered revoking the letters testamentary of the executor.

### 6. Estate audit by court-appointed master.

The appellant complains of the failure of the probate court to require completion of an estate audit by a court-appointed master. After some initial hearings in the case, the probate court did appoint Quinten Denny, a certified public accountant, as a master for the purpose of auditing the estate account. Mr. Denny commenced the audit and filed an interim report, along with a statement for services in the amount of $4,056. The probate court ordered the statement for the master's services to be paid from estate funds, but then entered an order that the audit was to be terminated unless at the expense of Mrs. Breen, the petitioner.

The appellant complains of this order, and requests that we order the trial court "to conclude the audit of this estate by a master or other qualified individual, to require said executor to account and reimburse the estate for all losses and expenses improperly charged to the estate, to require said executor to file final settlement at this time, and to remove said executor in this estate".

We have concluded that we can only reverse the judgment of the probate court insofar as it denied Mrs. Breen's application for the revocation of Mr. Miller's letters testamentary.

### 7. Further proceedings.

After remand of the case, it will be the duty of the probate court in compliance with § 473.140, RSMo 1978 (amended Ann. Supp.1981), to revoke the letters testamentary of the executor, and in compliance with § 473.147, RSMo 1978, to appoint a successor executor. It will be the responsibility of the removed executor in compliance with § 473.603, RSMo 1978, to file his final settlement. Exceptions to the final settlement (including any *prior interim settlement*) may be filed by any interested person, including the successor executor, § 473.587, RSMo 1978 (amended Ann.Supp. 1981). The successor executor and the beneficiaries have various remedies provided by the probate code. Of course, it will be the responsibility of the successor executor when appointed to take a vigorous adversary position in behalf of the estate to assure that the interests of the estate are properly represented. See *Murphey v. Dalton*, 314 S.W.2d 726, 732–733 [9–10, 13] (Mo. 1958); *Webb v. St. Louis County National Bank*, 551 S.W.2d 869, 882–883[13] (Mo.App. 1977). See also *In re Mills' Estate*, supra 162 S.W.2d at 811[5] (Mo.1942); 34 C.J.S. Executors and Administrators § 883 (1942).

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

All concur.